GREAT LAKES CHEMICAL
CORPORATION,
Plaintiff,

v.

MONSANTO COMPANY and Sweet
Technologies, Inc., Defendants.

No. Civ.A. 00–043–RRM.

United States District Court,
D. Delaware.

May 25, 2000.

William M. Lafferty, Jessica Zeldin, Morris Nichols Arsht & Tunnell, Wilmington, Delaware, H. Roderic Heard, John L. Eisel, Thomas M. Lynch, Tina M. Caravette, Samuel S. Cohen, Wildman, Harrold, Allen & Dixon, Chicago, Illinois, for plaintiff.

Richard L. Horwitz, John M. Seaman, Potter Anderson & Corroon LLP, Wilmington, Delaware, John W. Treece, Sheila A. Sundvall, Sidley & Austin, Chicago, Illinois, for defendants.

## OPINION

McKELVIE, District Judge.

This is a securities case. Plaintiff Great Lakes Chemical Corporation is a Delaware corporation with its principal place of business in Indianapolis, Indiana. Defendants Monsanto Company and its wholly owned subsidiary, Sweet Technologies, Inc.

("STI"), are Delaware corporations with their principal places of business in St. Louis, Missouri.

On May 3, 1999, Great Lakes purchased NSC Technologies Company, LLC ("NSC"), from Monsanto and STI. NSC is a Delaware limited liability company with its principal place of business in Mount Prospect, Illinois.

On January 4, 2000, Great Lakes filed the complaint in this action, alleging that Monsanto and STI violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by failing to disclose material information in conjunction with the sale of NSC. Great Lakes also alleges that defendants are liable for violating Indiana securities law, engaging in common law fraud, and breaching the sale contract, and that defendants must indemnify Great Lakes for all costs arising from the breaches of their representations and warranties in the purchase agreement. Great Lakes is seeking compensatory damages, punitive damages, indemnification, costs, fees, and rescission of the purchase agreement. With respect to a subsidiary agreement, Great Lakes is seeking a declaratory judgment that Monsanto is in breach of the agreement, and an order for specific performance of Monsanto's duties arising thereunder, or an award of consequential damages.

On March 9, 2000, Monsanto and STI moved to dismiss the complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), for failure to plead fraud with specificity and for failure to state a claim upon which relief may be granted. Among their assertions, Monsanto and STI argue that the interests sold to Great Lakes were not "securities," as defined by § 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and that Great Lakes has failed to plead adequate facts in support of its claim for securities fraud.

The parties have completed briefing on defendants' motion. On May 2, 2000, the court heard oral argument on the motion.

This is the court's decision on defendants' motion to dismiss.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the complaint and the documents attached to the complaint that have been incorporated by reference therein. For the purposes of a motion to dismiss, the court accepts all allegations in the complaint as true and draws all reasonable inferences in favor of Great Lakes. See Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir.1989).

### A. The Formation of NSC

#### 1. Creation of the NSC Unit within Monsanto

Monsanto is the world's largest manufacturer and distributor of L-phenylalanine ("L-phe"), an amino acid that is a principal ingredient in the sweetener aspartame. Monsanto manufactures and sells aspartame as the product NutraSweet. L-phe is also useful in the production of numerous pharmaceutical products.

In approximately 1985, Monsanto created the NSC Unit within its NutraSweet division to develop specialized pharmaceutical intermediates and pharmaceutical active compounds derived from L-phe. In 1995, Monsanto reorganized its NutraSweet division and established the NSC Unit as a separate reporting division of Monsanto Growth Enterprises. Monsanto retained the commercial rights to manufacture and sell L-phe and aspartame to the sweetener market. Monsanto restricted the NSC Unit's sales of L-phe to the pharmaceutical market and to a single customer in the sweetener market, Enzymologa, a Mexican manufacturer of aspartame. By 1998, the NSC Unit's principal business was based on the development and sale of L-phe and Tic–D, a pharmaceutical intermediate derived from L-phe.

### 2. Creation of NSC as a Limited Liability Company

On September 25, 1998, Monsanto entered into an agreement (the "LLC Agreement") with STI to establish the NSC Unit as a limited liability company called NSC Technologies Company, LLC ("NSC"), pursuant to the Delaware Limited Liability Company Act, 6 Del.C. § 18–101 et seq. The following terms of the LLC Agreement are relevant to the present dispute.

#### a. Members and Interests

The LLC Agreement names Monsanto and STI as the Members of NSC, and provides that each Member shall have an Interest in NSC. The LLC Agreement defines "Interest" as "[a] Member's Percentage Interest, right to distributions under Section 4.1 of this Agreement, and any other rights which such Member has in the Company." A Member's Percentage Interest is determined according to the Member's capital contributions to NSC. Pursuant to the LLC Agreement, Monsanto contributed assets to NSC totaling $162.9 million, and STI contributed assets totaling $37.1 million, giving the firms an 81.5% and 18.5% Percentage Interest, respectively, in NSC. The LLC Agreement establishes procedures for Members to adjust their Percentage Interest in NSC.

#### b. Net Cash Flow and other distributions

The Members are entitled to receive distributions of Net Cash Flow and allocations of profits and losses. Net Cash Flow is defined, essentially, as all cash receipts of NSC, excluding members' capital contributions, less all cash expenditures, accrued expenses, and loan payments due. Section 4.1 of the LLC Agreement establishes the allocation mechanism by which Members receive distributions of Net Cash Flow, as follows:

Net Cash Flow shall be determined at such times and in such amounts as the Board, in its sole discretion, shall determine. Any Net Cash Flow so distributed shall be distributed to the Members in the following order: (i) first, the pre-

ferred return on any Optional Capital Contributions, pro rata in accordance with the relative amounts thereof; (ii) second, any Optional Capital Contributions not previously returned, pro rata in accordance with the relative amounts thereof; (iii) third, any Additional Capital Contributions not previously returned, pro rata in accordance with the relative amounts thereof; (iv) fourth, any Capital Contributions to the extent not previously returned, pro rata in accordance with the relative amounts thereof; and (v) fifth, to the Members, pro rata in accordance with their respective Percentage Interests.

The LLC Agreement also provides that NSC's income, profits, gains, losses, deductions, and credits shall be allocated to the Members pro rata in accordance with their respective Percentage Interests.

#### c. Board of Managers

The LLC Agreement provides that the business and affairs of NSC shall be managed by a Board of Managers. As noted above, the Board, in its sole discretion, shall determine the Net Cash Flow of NSC, and shall distribute the Net Cash Flow to the Members on a pro rata basis. Except as otherwise provided for in the LLC Agreement, the Board of Managers has exclusive authority to bind NSC, and to manage and control NSC's business and affairs. The LLC Agreement states:

Except as otherwise expressly set forth in this Agreement, the Members shall not have any authority, right, or power to bind the Company, or to manage or control, or to participate in the management or control of, the business and affairs of the Company in any manner whatsoever. Such management shall in every respect be the full and complete responsibility of the Board alone as provided in this Agreement.

The Members of NSC may remove the Managers with or without cause.

### d. *Members' voting rights*

The Members of NSC are entitled to vote on certain matters, including on all incurrences of indebtedness or guarantees thereof. The LLC Agreement specifies that a Majority in Interest, which is defined as 51% of the Percentage Interests owned by the Members, is required to constitute a quorum, or to amend the LLC Agreement.

### e. *Transfer of Interests*

The LLC Agreement restricts the ability of Members to transfer or otherwise dispose of their Interests in NSC absent consent of the Board. Moreover, Members are prohibited from disposing of their Interests in NSC when the disposition would cause NSC to be taxable as a corporation, would violate federal or state securities laws, or would violate other laws or commitments binding on NSC. In full, § 6.1(a) of the LLC Agreement provides:

> No Member may sell, assign, transfer or otherwise dispose of, or pledge, hypothecate or otherwise encumber his Interest without the prior consent of the Board, and any such act in violation hereof shall be of no effect and shall not be binding on the Company. Anything contained herein to the contrary notwithstanding, no Member may sell, assign, transfer, encumber or otherwise dispose of his Interest if such disposition would (i) cause the Company to be treated as an association taxable as a corporation (rather than a partnership) for federal income tax purposes; (ii) violate the provisions of any federal or state securities laws; or (iii) violate the terms of (or result in a default or acceleration under) any law, rule, regulation, agreement or commitment binding on the Company.

The LLC Agreement establishes procedures for assigning the whole or any portion of a Member's Interest to a Substituted Member.

### B. *The Sale of NSC*

#### 1. *Solicitation of Great Lakes*

In October 1998, BancBoston Robertson Stephens, an investment bank, prepared a Confidential Descriptive Memorandum (the "Offering Memorandum") on behalf of Monsanto and STI to promote the sale of NSC. The Offering Memorandum provides an overview of NSC's business, identifies potential growth opportunities and strategies for NSC, and reports NSC's financial performance. The Offering Memorandum recites that NSC's sales increased from $8.3 million in 1995 to $34.5 million in 1997, and projects that NSC's sales would increase to $93.2 million in 1999 and $192.2 million by 2002.

On November 10, 1998, Monsanto and STI presented the Offering Memorandum to Great Lakes, together with a letter from BancBoston Robertson Stephens proposing that final bids be submitted by year end. On November 12, 1998, Great Lakes responded to the solicitation with a letter indicating its interest in submitting a bid.

On December 11, 1998, Ian Wolpert, a Vice-President of Monsanto and the authorized representative of defendants, met with representatives from another interested bidder. Wolpert allegedly told the bidder's representatives that he stood behind the defendants' recently issued sales projections. After Wolpert made these remarks, Fred Beyerlein, the Co–Chief Operating Officer of NSC, allegedly spoke to Wolpert outside the meeting, taking exception to Wolpert's remarks, and voicing concern about the sales projections. Wolpert allegedly became angry, and advised Beyerlein that it was his job to be an active and enthusiastic participant in the sale process.

#### 2. *Changes in the Market for L-phe and Tic–D*

In early 1999, as negotiations over the sale of NSC continued, a number of events were occurring that may have impacted the business prospects of NSC.

Monsanto and other competing producers of L-phe, in particular the Korean firm Daesang, began discounting the sale price of L-phe in the sweetener market. As the price of L-phe dropped, NSC allegedly began experiencing diminished sales of L-phe, particularly to NSC's sole customer in the sweetener market, Enzymologa. Moreover, an Italian firm, Archimica, was producing Tic–D, a pharmaceutical intermediate derived from L-phe, by a manufacturing process that allegedly infringed the claims of a United States patent assigned to NSC. Archimica was allegedly selling Tic–D products to NSC's customers.

### 3. Great Lakes' Offer to Purchase NSC, and Monsanto's Revision of NSC's Financial Projections

On January 15, 1999, Wolpert provided representatives of Great Lakes with revised sales projections for NSC, reducing the forecast of $93.2 million originally stated in the Offering Memorandum to $78 million.

The following week, Great Lakes offered to acquire defendants' Interests in NSC for approximately $130 million.

During the months of January through April 1999, Great Lakes conducted due diligence concerning NSC's business, intellectual property, its product markets, and its actual and projected sales. During these months, defendants allegedly instructed NSC's management not to speak directly to Great Lakes regarding sales, sales forecasts, customer orders and other information, telling NSC management, instead, that all such inquiries should be channeled to defendants' representatives who would respond to Great Lakes.

In February 1999, defendants allegedly informed NSC's management that defendants were considering ending negotiations with Great Lakes and seeking a new buyer. NSC's management allegedly told defendants that, in light of reduced sales in 1999, seeking a new buyer would necessitate a complete revision of the Offering Memorandum. Allegedly as a result of these communications, defendants continued negotiations with Great Lakes.

On March 15, 1999, during a teleconference call with Wolpert, representatives from Great Lakes raised concerns about defendants' sales projections for NSC. Wolpert allegedly replied that the reduced sales in 1999 were the result of temporary reductions in orders and the accelerated posting of 1999 sales in 1998, and that the shortfall in sales in the first quarter of 1999 would benefit Great Lakes because those deferred sales would be realized after Great Lakes acquired NSC.

On March 16, 1999, Monsanto and STI provided Great Lakes with revised financial projections, stating that NSC could realize total sales of approximately $68.2 million in 1999. Defendants allegedly assured Great Lakes that NSC's total sales would increase to $124.1 million in 2000, $149.9 million in 2001, and $184 million in 2002. At a meeting the same week between defendants and Great Lakes, Wolpert allegedly stated to Great Lakes' representative that defendants "stood by" these sales projections. After the meeting, Beyerlein allegedly told Wolpert that he, Beyerlein, did not stand behind the projections. Defendants allegedly prohibited Beyerlein from advising Great Lakes of his opinions.

In early April 1999, the parties adjusted the purchase price for NSC from $130 million to $125 million. On April 8, 1999, the parties entered into an Ownership Interest Purchase Agreement (the "Purchase Agreement"). On April 12, 1999, Wolpert executed the Purchase Agreement on behalf of defendants, and on April 14, Great Lakes executed the Purchase Agreement. The parties closed the transaction on May 3, 1999.

### 4. The Purchase Agreement

### a. Characterization of Interests as "equity securities"

In setting forth the sellers' representations and warranties, the Purchase Agree-

ment refers to the Ownership Interests in NSC being transferred as "equity securities." In full, § 4.1(a) states:

> Monsanto owns 31.6 percent of the Ownership Interests and STI owns 68.4 percent of the Ownership Interests, free and clear of any and all liens, encumbrances, restrictions and rights of any nature held by other persons. The Ownership Interests represent 100% of the issued and outstanding equity securities of the Company, all of which are owned by the Sellers and all of which have been duly authorized, are validly issued, fully paid, and nonassessable, and are held of record by the Sellers. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that obligate the Company to issue, sell, or otherwise cause to become outstanding any of its equity securities. There are no outstanding or authorized equity appreciation, phantom equity, or similar rights with respect to the Company. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the equity securities of the Company.

**b.** *Representation and warranty of NSC's financial position*

In § 4.6 of the Purchase Agreement, Monsanto and STI make the representation and warranty that, except as otherwise provided, the financial statements provided by defendants to Great Lakes "reflect all material items and present fairly in all material respects the financial position of the Company as of the dates thereof and the results of operations for the periods described therein."

**c.** *Representation and warranty as to lack of adverse changes*

In § 4.7(a) of the Purchase Agreement, Monsanto and STI make the representation and warranty that, since December 31, 1998, "there has been no change in the business of the Company," which would have a "negative effect or negative change

on the operations, results of operations or condition (financial or otherwise) in an amount equal to $6,500,000 or more."

**d.** *Responsibility of Great Lakes to evaluate NSC*

The Purchase Agreement includes a disclaimer which states that Great Lakes is to take full responsibility for evaluating the accuracy of all estimates and projections furnished to it by Monsanto and STI. Section 6.10 of the Purchase Agreement, in part, states:

> In connection with the Buyer's investigation of the Company, the Buyer may have received from or on behalf of the Sellers certain projections, including projected statements of operating revenues and income from operations of the Company. The Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that the Buyer has received no representation or warranty from either Seller with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

**e.** *Transaction Agreements*

The Purchase Agreement provides that the parties shall enter into a number of Transaction Agreements prior to the closing of the Purchase Agreement, including a Supply Agreement, under which Monsanto would agree to continue to manufacture certain L-phe products for sale to NSC. Section 9 of the Supply Agreement, which was entered into on May 1, 1999,

provides in pertinent part that Monsanto shall set aside on consignment "Safety Stock," which is defined as a quantity of identified L-phe products equal to one-sixth of the products shipped from Monsanto to NSC during the previous year.

### f. *Indemnification* ·

Section 11.1 of the Purchase Agreement states that, except as otherwise provided, Monsanto and STI "will indemnify and reimburse the Buyer for any and all claims, losses, liabilities, damages, penalties, fines, costs and expenses ... incurred by the Buyer and its Affiliates" as a result of, among other things, any breach or inaccuracy of any representation or warranty made by Monsanto or STI as set forth in the Purchase Agreement.

### C. *The Dissolution of NSC*

On October 5, 1999, Great Lakes filed a Certificate of Cancellation with the State of Delaware, dissolving NSC as a separate entity. NSC's actual sales for 1999 were approximately $33 million, less than 50% of the projections provided by Monsanto and STI to Great Lakes in March 1999.

### D. *The Lawsuit*

### 1. *Great Lakes' Complaint*

On January 20, 2000, Great Lakes filed an eight count complaint in this court. Count I asserts that Monsanto and STI violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by making material misrepresentations and by failing to disclose material facts in connection with the sale of securities. Count II asserts that Monsanto and STI violated Indiana securities law, § 23–2–1–1 *et seq.*, by making material misrepresentations and by failing to disclose material facts in conjunction with the sale of securities. Count III asserts that Monsanto and STI engaged in common law fraud by knowingly or recklessly making material misrepresentations and failing to disclose material facts in conjunction with the sale of NSC. Count IV asserts that Monsanto and STI fraudulently induced Great Lakes to purchase NSC. Count V asserts that Monsanto and STI breached their warranties and representations given in § 4.7 of the Purchase Agreement, as NSC had sustained adverse changes to its business in excess of $6.5 million between December 31, 1998 and April 30, 1999. Count VI asserts that Monsanto and STI breached the Supply Agreement by failing to supply NSC with a quantity of Safety Stock of certain L-phe products. Count VII asserts that Monsanto and STI breached their representations and warranties that the financial statements of NSC fairly represented NSC's financial position. Count VIII asserts that Great Lakes is entitled to indemnification for all damages and claims arising out of the breach or inaccuracy of any representation or warranty of the defendants as set forth in the Purchase Agreement.

As to Counts I and III, Great Lakes seeks compensatory damages in excess of $58 million, plus costs, fees, and prejudgment interest. As to Counts II and IV, Great Lakes seeks to rescind the Purchase Agreement and to recover $125 million as the full amount paid by Great Lakes for the Interest in NSC, plus costs, fees, and prejudgment interest, or to recover compensatory damages in excess of $58 million plus costs, fees, and prejudgment interest. As to Count VI, Great Lakes seeks a declaratory judgment that Monsanto is in breach of the Supply Agreement and an order for specific performance under the Supply Agreement, or an award of consequential damages. As to Count VII, Great Lakes seeks an award of compensatory damages in excess of $680,000, plus costs, fees, and prejudgment interest. As to Counts V and VIII, Great Lakes seeks an award of indemnified damages in the aggregate sum of $13 million for its attorneys' fees and costs of suit. As to Counts III, IV, and V, Great Lakes seeks an award of punitive damages and fees.

Great Lakes asserts that this court has subject matter jurisdiction over its federal

securities law claim, pursuant to 28 U.S.C. § 1331, and pendent jurisdiction over its state law and common law claims.

### 2. *Defendants' Motion to Dismiss*

On March 9, 2000, Monsanto and STI moved to dismiss the complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) for failure to plead fraud with specificity and for failure to state a claim upon which relief may be granted. Monsanto and STI assert that Great Lakes' federal and state securities claims fail as a matter of law because the Interests in NSC transferred pursuant to the Purchase Agreement do not constitute "securities" under federal or state law, and because plaintiffs fail to adequately plead fraud. Monsanto and STI argue that if plaintiff's federal securities claim is dismissed, plaintiff's state law claims should be dismissed for lack of supplemental jurisdiction. Monsanto and STI argue, moreover, that all plaintiffs' state law claims, with the exception of Count VII, also fail as a matter of law.

## II. *DISCUSSION*

### A. *What Is an LLC?*

In Delaware, LLCs are formed pursuant to the Delaware Limited Liability Company Act, 6 Del.C. § 18–101 *et seq.* LLCs are hybrid entities that combine desirable characteristics of corporations, limited partnerships, and general partnerships. LLCs are entitled to partnership status for federal income tax purposes under certain circumstances, which permits LLC members to avoid double taxation, i.e., taxation of the entity as well as taxation of the members' incomes. *See* Treas.Reg. § 301.7701–1 *et seq.* Moreover, LLCs members, unlike partners in general partnerships, may have limited liability, such that LLC members who are involved in managing the LLC may avoid becoming personally liable for its debts and obligations. *See* 6 Del.C. § 18–303. In addition, LLCs have greater flexibility than corporations in terms of organizational structure. The Delaware Limited Liability Company Act, for example, establishes the default rule that management of an LLC shall be vested in its members, but permits members to establish other forms of governance in their LLC agreements. *See* 6 Del.C. § 18–402.

The following law review articles provide additional commentary on the characteristics of LLCs: Michael J. Garrison & Terry W. Kneopfle, *Limited Liability Company Interests as Securities: A Proposed Framework for Analysis,* 33 Am.Bus.L.J. 577 (1996); Park McGinty, *The Limited Liability Company: Opportunity for Selective Securities Law Deregulation,* 64 U.Cin.L.Rev. 369 (1996); Carol R. Goforth, *Why Limited Liability Company Membership Interests Should Not Be Treated as Securities and Possible Steps to Encourage This Result,* 45 Hastings L.J. 1223 (1994); and Mark A. Sargent, *Are Limited Liability Company Interests Securities?,* 19 Pepp.L.Rev. 1069 (1992).

### B. *Are the Interests in NSC That Were Transferred Pursuant to the Purchase Agreement "Securities" Under Federal Law?*

To prevail in its claim that defendants engaged in securities fraud under § 10(b) of the Securities Exchange Act of 1934, Great Lakes must demonstrate that: (i) defendants made a misstatement or omission; (ii) of a material fact; (iii) with scienter; (iv) in connection with the purchase or sale of securities; (v) upon which plaintiffs relied; and (vi) that reliance proximately caused plaintiffs' losses. *See In re Westinghouse Securities Litigation,* 90 F.3d 696, 710 (3d Cir.1996). A threshold question in this matter is whether defendants' alleged misconduct involved a purchase or sale of securities. Defendants contend that plaintiff's claim fails as a matter of law because the Interests in NSC do not constitute securities.

Section 2(a)(1) of the Securities Act of 1933 lists financial instruments that qualify as securities, as follows:

> The term "security" means any note, stock, treasury stock, bond, debenture,

evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1). Among the securities enumerated in § 2(a)(1) of the Securities Act, Great Lakes contends that the Interests in NSC constitute either "stock," an "investment contract," or "any interest or instrument commonly known as a 'security.'"

### 1. *Key Cases Governing the Characterization of Novel Instruments*

It is helpful, before determining whether the Interests in NSC constitute "stock," an "investment contract," or "any interest or instrument commonly known as a security," to review a series of cases that provide guidance as to how to characterize novel financial instruments.

### a. *SEC v. W.J. Howey*

The Supreme Court defined the parameters of an "investment contract" for the purposes of federal securities law in the case of *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *Howey* concerned a Florida corporation, the Howey Company, that sold small tracts of land in a citrus grove to forty-two purchasers, many of whom were patrons of a resort hotel. *See id.* at 296,

66 S.Ct. 1100. For the most part, the purchasers lacked the knowledge, skill, and equipment necessary for the care and cultivation of citrus trees. They invested in the enterprise for profit. The purchasers were free to contract with a number of companies to service the tracts, but the sales contract stressed the superiority of Howey–in–the–Hills Service, Inc., which the purchasers chose to service 85% of the acreage sold. The service contracts granted Howey–in–the–Hills full and complete possession of the acreage, and the individual purchasers had no right of entry to market the crop. Purchasers of tracts shared in the profits of the enterprise, which amounted to 20% in the 1943–44 growing season. The Howey Company did not register the interests in the enterprise as securities.

The Securities and Exchange Commission ("SEC") brought an action pursuant to § 5(a) of the Securities Act, 15 U.S.C. § 77e(a), seeking to enjoin the Howey Company from using interstate mail to offer and sell interests in the enterprise. Because the interests at issue did not constitute any of the traditional kinds of securities enumerated in § 2(a)(1) of the Securities Act, the SEC argued that the interests were "investment contracts." Noting that the term "investment contract" was not defined by Congress, but that the term was widely used in state securities laws, the Court largely adopted the definition used at the time by state courts. The Court stated that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298–99, 66 S.Ct. 1100. Thus, the three requirements for establishing an investment contract are: (1) "an investment of money," (2) "in a common enterprise," (3) "with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. 1100. In articulating this test, the Supreme Court stated that this definition

"embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. 1100.

### b. *United Housing Foundation, Inc. v. Forman*

The Supreme Court established guidelines for whether non-traditional instruments labeled "stock" constitute securities in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). *Forman* concerned a nonprofit housing cooperative that sold shares of "stock" to prospective tenants. The sole purpose of acquiring the shares was to enable the purchaser to occupy an apartment in the cooperative. The shares essentially represented a recoverable deposit on the apartment. The shares were explicitly tied to the apartment, as they could not be transferred to a non-tenant. Nor could they be pledged or encumbered. No voting rights attached to the shares.

After the housing cooperative raised rental charges, the residents sued the cooperative under § 17(a) of the Securities Act, 15 U.S.C. § 77q(a), asserting that the cooperative falsely represented that it would bear all subsequent cost increases due to factors such as inflation. The Supreme Court held that the "stock" issued by the cooperative did not constitute a security. The shares, the Court found, lacked the five most common features of stock: (1) the right to receive dividends contingent upon an apportionment of profits; (2) negotiability; (3) the ability to be pledged or hypothecated; (4) voting rights in proportion to the number of shares owned; and (5) the ability to appreciate in value. *Id.* at 851, 95 S.Ct. 2051. Finding that the purchasers obtained the shares in order to acquire subsidized low-cost living space, not to invest for profit, the Court ruled that the "stock" issued by the cooperative was not a security. *See id.* at 852, 95 S.Ct. 2051.

### c. *Landreth Timber Co. v. Landreth*

Following the issuance of *Forman,* a number of lower courts began to apply the *Howey* test to distinguish between investment transactions, which were covered by the securities laws, and commercial transactions, which were not. *See, e.g., Landreth Timber Co. v. Landreth,* 731 F.2d 1348, 1352 (9th Cir.1984) (citing cases). In *Landreth,* the Ninth Circuit addressed whether a single individual who purchased 100% of the stock in a lumber corporation, and who had the power to actively manage the acquired business, could state a claim under the securities laws for alleged fraud in the sale of the business. The Ninth Circuit found that the purchaser bought full control of the corporation, and that the economic reality of the transaction was the purchase of a business, and not an investment in a security. *See id.* at 1353. The court held that the sale of 100% of the stock of a closely held corporation was not a transaction involving a "security."

Reversing the Ninth Circuit, the Supreme Court reasoned that it would be burdensome to apply the *Howey* test to transactions involving traditional stock. *See Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686–88, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). The Court held that, insofar as a transaction involves the sale of an instrument called "stock," and the stock bears the five common attributes of stock enumerated in *Forman,* the transaction is governed by the securities laws. The Court noted that stock is specifically enumerated in § 2(a)(1) of the Securities Act as a security, and that stock is so "quintessentially a security" that it is unnecessary to apply the *Howey* test to determine if it is a security. *Id.* at 693, 105 S.Ct. 2297. The financial instrument involved in the case, the Court reasoned, "is traditional stock, plainly within the statutory definition." *Id.* at 690, 105 S.Ct. 2297. "There is no need here," the Court continued, "to look beyond the characteristics of the instrument to determine whether the [Securities] Acts apply." *Id.* The Court stated

that the *Howey* test should only be applied to determine whether an instrument is an "investment contract," and should not be applied in the context of other instruments enumerated in § 2(a)(1) of the Securities Act. *See id.* at 691–92, 105 S.Ct. 2297.

### d. *Penturelli v. Spector, Cohen, Gordon & Rosen*

In *Penturelli v. Spector, Cohen, Gadon & Rosen*, 779 F.2d 160 (3d Cir.1985), the Third Circuit reaffirmed that the *Howey* test should not be used to determine whether instruments that are enumerated in the Securities Act constitute securities. In *Penturelli*, an individual, Bernardo Penturelli, purchased 28 fractional undivided working interests in a coal mining operation. Penturelli relied on the advice of his accountant that purchasing the interests would result in significant tax benefits. The accountants and other parties connected with the mining operations allegedly diverted Penturelli's funds to mine worthless land, and the tax benefits never materialized. Penturelli brought suit under 15 U.S.C. § 10(b).

The district court found that Penturelli exercised managerial control over the mining operations, and dismissed the complaint because Penturelli was not a sufficiently passive investor under the *Howey* test. The Third Circuit reversed. Noting that fractional undivided interests in mining operations are listed as securities in § 2(a)(1) of the Securities Act, the court reasoned that under *Landreth*, it was unnecessary to apply the *Howey* test. *See id.* at 164–65.

### 2. *Prior Cases Concerning Whether Interests in LLCs are Securities*

The present case raises novel issues regarding the regulation of transactions involving interests in LLCs. The court has identified three cases in which other courts have determined whether interests in LLCs constitute securities.

### a. *Keith v. Black Diamond Advisors, Inc.*

In *Keith v. Black Diamond Advisors, Inc.*, 48 F.Supp.2d 326 (S.D.N.Y.1999), the plaintiff, Keith, founded a sub-prime mortgage lending firm, Eagle Corp., and brought it to profitability. Milton was an original investor in Eagle. Black Diamond, a venture capital firm, proposed a joint venture in which it would contribute $150,000 in cash, and Keith and Milton would each contribute their interests in Eagle, to form a New York limited liability company, Pace LLC. Through this transaction, Black Diamond acquired 50% of the interests in Pace, and Keith and Milton each received a 25% stake. Keith alleged that Black Diamond subsequently used its majority position to strip him of control of Pace. Keith sued Black Diamond for federal securities fraud.

The court applied the *Howey* test, and found that Keith had invested money in a common enterprise. The court, however, found that Keith had retained substantial control over the enterprise, such that he did not have an expectation of profits "solely from the efforts of others." As such, the court concluded that the LLC interests were not investment contracts. The court dismissed the case for lack of jurisdiction.

### b. *SEC v. Parkersburg Wireless LLC*

*SEC v. Parkersburg Wireless LLC*, 991 F.Supp. 6 (D.D.C.1997), involves a LLC that was established to provide wireless cable services. The promoters of the company sold "memberships" in the company to over 700 individuals in 43 states. The promoters targeted prospective investors who had Individual Retirement Accounts, and encouraged them to divert funds from their IRAs to buy membership units of the company.

The SEC sought to enjoin the sale of the membership interests. The court found that the interests sold in the LLC "easily satisfy" the *Howey* test for investment contracts. The investors' $10,000 mini-

mum contribution constituted an "investment of money." Because the 700 individuals were to receive a pro rata share of the company's revenues, the court found there was a common enterprise. Moreover, the investors had little, if any, input into the company, so their profits were to come solely from the efforts of others.

### c. *SEC v. Shreveport Wireless Cable Television Partnership*

*SEC v. Shreveport Wireless Cable Television Partnership*, 1998 WL 892948 (D.D.C.1998), involves three entities: Reading Partnership and Shreveport Partnership, which are both general partnerships, and Baton Rouge LLC. All three entities were established to provide wireless cable services. Each entity engaged the services of a corporation to develop the telecommunications services and to solicit public investment in the enterprises. The promoters sold memberships in the three entities to approximately 2000 investors.

The SEC sought to enjoin the sale of interests in the ventures. In ruling upon defendants' motion for summary judgment that the interests were not securities, the court applied the *Howey* test to determine whether the interests were investment contracts. The court found that the purchasers of the interests had invested money in a common enterprise. The court found, however, that there was a question of fact as to whether the investors exercised significant control over the management of the corporation, and denied defendants' motion for summary judgment.

Having reviewed these other cases in which courts have considered whether LLC interests might constitute securities, the court will determine whether the Interests in NSC constitute "stock," an "investment contract," or "any interest or instrument commonly known as a security."

### 3. *Are the Interests In NSC "Stock"?*

Great Lakes contends that NSC is the functional equivalent of a corporation, and that the Interests in NSC should be treated as stock. Great Lakes notes that the LLC Agreement refers to the Interests as "equity securities," and that the LLC Agreement prohibits the transfer of the Interests in such a way as would "violate the provisions of any federal or state securities laws."

Monsanto and STI, on the other hand, contend that the Interests cannot be stock because NSC is not a corporation.

As discussed above, the Supreme Court has described the five most common characteristics of stock as follows: (1) the right to receive dividends contingent upon an apportionment of profit; (2) negotiability; (3) the ability to be pledged or hypothecated; (4) the conferring of voting rights in proportion to the number of shares owned; and (5) the capacity to appreciate in value. *See Landreth*, 471 U.S. at 686, 105 S.Ct. 2297; *Forman*, 421 U.S. at 851, 95 S.Ct. 2051.

As noted by plaintiffs, these attributes of stock also characterize, at least to some degree, the Interests in NSC. NSC's Members are entitled to share, pro rata, in distributions of Net Cash Flow, contingent upon its distribution by the Board of Managers. The Interests are negotiable and may be pledged or hypothecated, subject to approval by the Board of Managers. *See Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33, 37 (2d Cir.1986) (stating that some limitations on a stock's negotiability and pledge ability are insufficient to negate the character of the stock as a security). Members in NSC have voting rights in proportion to their Percentage Interest in the company. And, the Interests in NSC have the capacity to appreciate in value. The Interests in NSC are undoubtedly stock-like in character, but the question remains if the Interests can be characterized as "stock" for the purposes of the federal securities laws.

■ The primary goal of the securities laws is to regulate investments, and not commercial ventures. *See Howey*, 328 U.S. at 298, 66 S.Ct. 1100 (restricting

scope of "investment contracts" to those enterprises with passive investors); *Reves v. Ernst & Young*, 494 U.S. 56, 64–65, 110 S.Ct. 945, 108 L.Ed.2d 47 (1989) (articulating "family resemblance test" to distinguish between notes that are used in the investment market from those having commercial character). In transactions involving traditional stock, lower courts had attempted to distinguish between investment transactions and commercial transactions. *See Landreth*, 731 F.2d at 1352. The Supreme Court, as discussed above, held that it is unnecessary to attempt to distinguish between commercial and investment transactions when the financial instrument in question is traditional stock. *See Landreth*, 471 U.S. at 690, 105 S.Ct. 2297. Because stock is listed in § 2(a)(1) of the Securities Act as a security, and because people trading in traditional stock are likely to have a high expectation that their activities are governed by the securities laws, the Court ruled that all transactions involving traditional stock are covered by the securities laws, regardless if the transaction is of an investment or commercial character. *See id.* The Court expressly limited this rule to transactions involving traditional stock. *See id.* at 694, 105 S.Ct. 2297.

The Supreme Court suggested, prior to the issuance of *Landreth*, that certain stock-like instruments might be construed as "stock" for the purposes of the federal securities laws. In *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), the Court considered whether purchasers of withdrawable capital shares in a savings and loan association could state a claim under the federal securities laws for allegedly misleading statements made in solicitation materials. Holders of the withdrawable capital shares were entitled to be members of the association and were granted voting rights in proportion to the number of shares they owned. The holders were entitled to dividends declared by the association's board of directors and based on the association's profits. Certain restrictions applied to the transferability of the instruments. The Court rejected the lower court's finding that the restrictions on negotiability precluded a finding that the shares were securities. The Court ruled that the instruments constituted "investment contracts" under *Howey*. *See id.* at 349, 88 S.Ct. 548. The Court continued, stating that the instruments could also be characterized as "certificates of interest or participation in any profit-sharing agreement," as "transferable shares," or as "stock." *Id.* at 349–50, 88 S.Ct. 548. The Court held that the holders of withdrawable capital shares were entitled to the protections afforded by the securities laws.

In *Marine Bank v. Weaver*, 455 U.S. 551, 557, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), the Court reaffirmed its holding in *Tcherepnin* that the withdrawable capital shares in that case were "like ordinary shares of stock." This statement arose in the context of a suit brought by holders of certificates of deposit who were allegedly defrauded into pledging their certificates to guaranty a third party loan. The lower court held that the certificates of deposit were securities, as they were deemed to be the functional equivalent of the withdrawable capital shares at issue in *Tcherepnin*. *See id.* at 557, 102 S.Ct. 1220. The Court found that the certificates of deposit had different characteristics than withdrawable capital shares, as they conferred upon their holders the right to a fixed rate of interest and did not entitle holders to voting rights. The Court found that the certificates of deposit were not securities.

Although, in *Tcherepnin*, the Supreme Court found that stock-like instruments could be deemed "stock" for the purposes of federal securities law, this court does not find *Tcherepnin* controlling in the present case. *Tcherepnin* preceded *Landreth*, which holds that the per se rule announced in that case should apply only to transactions involving traditional stock, because the name "stock" serves to put parties on notice that the transaction is governed by the securities laws. *See Landreth*, 471 U.S. at 690, 105 S.Ct. 2297.

Moreover, the withdrawable capital shares at issue in *Tcherepnin* were clearly investment instruments, and there is no indication that the holding in that case would apply to stock-like instruments used in commercial ventures. *See Tcherepnin*, 389 U.S. at 339, 88 S.Ct. 548. Although the Court subsequently reiterated in *Marine Bank* that the withdrawable capital shares in *Tcherepnin* were "stock-like," *see Marine Bank*, 455 U.S. at 557, 102 S.Ct. 1220, the Court did so in order to distinguish certificates of deposit from other instruments deemed to be securities, and did not appear to hold that all "stock-like" instruments should be regulated as securities.

In the present case, the LLC Interests, although they are "stock-like" in nature, are not traditional stock. *Landreth*, thus, is inapplicable to this case, and the court must determine whether the sale of NSC was essentially an investment transaction, in which case the securities laws apply, or whether it was a commercial transaction, in which case they do not. To make this determination, the court will apply the *Howey* test for investment contracts. *See Landreth*, 471 U.S. at 691–92, 105 S.Ct. 2297; *see also Keith v. Black Diamond Advisors, Inc.*, 48 F.Supp.2d 326 (S.D.N.Y. 1999) (dismissing securities fraud complaint after applying only the *Howey* test to determine whether interests in an LLC were securities). The court will also consider whether the Interests can be characterized as "any interest or instrument commonly known as a security."

### 4. Are the Interests in NSC an "Investment Contract"?

■ As stated above, to constitute an "investment contract," the instruments purchased by Great Lakes must involve: (1) "an investment of money," (2) "in a common enterprise," (3) "with profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301, 66 S.Ct. 1100. The parties do not dispute that the first prong of the *Howey* test—an investment of money—is satisfied by the facts of this case. The court will now consider whether

Great Lakes invested in a "common enterprise," and whether Great Lakes' profits in NSC were to come "solely from the efforts of others."

#### a. Did Great Lakes invest in a "common enterprise"?

Monsanto and STI argue that Great Lakes' purchase of the Interests in NSC fails the second prong of the *Howey* test, which requires that an investor invest its money in a "common enterprise." According to defendants, Great Lakes bought the entirety of NSC without pooling its contributions with those of other investors.

Great Lakes, on the other hand, contends that when Monsanto and STI created NSC, they pooled their resources and established NSC as a common enterprise. At the time of sale of the membership Interests, Great Lakes contends, the Interests were securities, and they did not cease to be securities when they were transferred to Great Lakes.

■ To determine whether a party has invested funds in a common enterprise, courts look to whether there is horizontal commonality between investors, or vertical commonality between a promoter and an investor. Horizontal commonality requires a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors. *Steinhardt Group Inc. v. Citicorp*, 126 F.3d 144, 151 (3d Cir.1997). The vertical commonality test is less stringent, and requires that an investor and promoter be engaged in a common enterprise, with the "fortunes of the investors linked with those of the promoters." *Securities and Exchange Commission v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir.1991); *Securities and Exchange Commission v. Professional Associates*, 731 F.2d 349, 354 (6th Cir.1984). The Third Circuit has applied the horizontal commonality approach, *see Salcer v. Merrill Lynch, Pierce, Fenner and Smith Inc.*, 682 F.2d 459, 460 (3d Cir.1982), but has subsequently indicated that the vertical commonality test might

be applicable in other cases, *see Steinhardt,* 126 F.3d at 152.

In this case, Great Lakes bought 100% of the Interests of NSC from Monsanto and STI. Great Lakes, accordingly, did not pool its contributions with those of other investors, as is required for horizontal commonality. After the sale, Monsanto and STI retained no interest in NSC, so it cannot be said that the fortunes of Great Lakes were linked to those of defendants, as is required for vertical commonality.

Great Lakes urges that when the Interests in NSC were created, Monsanto and STI pooled their contributions in a common enterprise. Great Lakes contends that Monsanto's and STI's Interests were securities when they were created, and that they did not cease to be securities when conveyed to Great Lakes. In support of this proposition, Great Lakes relies on *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir.1976).

*Great Western* involves a company, Artko, that obtained a line of credit from a bank and executed an interest-bearing, unsecured promissory note to the bank. The bank allegedly relied on considerable financial data prepared by Artko before extending the line of credit. After the bank did not receive payment on the note, it sought recovery from Artko's president under § 17(a) of the Securities Act, 15 U.S.C. § 77q(a). The question before the court was whether the promissory note constituted a security. Although "notes" are included in the statutory definition of a security, 15 U.S.C. § 77b(a)(1), the court recognized that not all notes are securities. *See Great Western,* 532 F.2d at 1256 (citing cases). The court inquired whether the bank had contributed "risk capital" subject to the "entrepreneurial or managerial efforts" of Artko, as would support a finding that the note was a security. *See id.* at 1257. The court stated that the circumstances of issuance of the note, rather than how the proceeds of the line of credit were used, were determinative of the character of the note. *See Great Western,* 532 F.2d at 1258. *Great Western*

reaffirms the principle that the character of a financial instrument is determined by the terms of its offer, the plan of its distribution, and the economic inducements held out to potential purchasers. *See SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 352–53, 64 S.Ct. 120, 88 L.Ed. 88 (1943). *Great Western* does not draw into question the principle that courts are to look at the specific transaction at issue to determine whether the interests being transferred are securities. *See Steinhardt,* 126 F.3d at 153.

In this case, the challenged transaction is the sale of NSC by defendants to Great Lakes, and not the formation of NSC. Thus, the fact that Monsanto and STI pooled their contributions in the formation of NSC does not change the character of the sale of NSC to Great Lakes. The court concludes that Great Lakes did not invest in a common enterprise.

b. *Were Great Lakes' Profits in NSC To Come "Solely from the Efforts of Others"?*

Monsanto and STI argue that the profits in NSC did not come solely from the efforts of others, as would support a finding that the Interests in NSC were securities. *Howey,* 328 U.S. at 298–99, 66 S.Ct. 1100. Rather, defendants contend that Great Lakes had the power to control NSC through its authority to remove managers with or without cause, and to dissolve the entity.

Great Lakes argues, on the other hand, that it depended solely on the efforts of others to profit from NSC, as the LLC Agreement provides that the Members would retain no authority, right, or power to manage or control the operations of the company. In the alternative, Great Lakes contends that the *Howey* test does not apply to the sale of 100% of a business over which the purchaser intended to exercise control.

i. *profits solely from the efforts of others*

There is little caselaw establishing guidelines for determining whether a member in an LLC is sufficiently passive that he is dependent solely on the efforts of others for profits. In the context of general partnerships and limited partnerships, by contrast, there has been extensive litigation on whether partnership interests may qualify as securities. An analogy to partnership law is convenient for analyzing interests in LLCs, but there are important differences between general partnerships, limited partnerships, and LLCs.

General partnerships in Delaware are formed pursuant to the Delaware Revised Uniform Partnership Act, 6 Del.C. § 15–101 *et seq.* Each partner has equal rights in the management and conduct of the partnership business and affairs. 6 Del.C. § 15–401(f). In general, all partners are liable jointly and severally for all obligations of the partnership. 6 Del.C. § 15–306(a). Because partners have equal rights in the management of general partnerships, and because they are not protected by limited liability, courts consistently state that partners in general partnerships are unlikely to be passive investors who profit solely on the efforts of others. Some courts have adopted per se rules that partnership interests are not securities. *See, e.g., Goodwin v. Elkins & Co.,* 730 F.2d 99, 107 (3d Cir.1984). Other courts have adopted a presumption that partnership interests are not securities, but permit a finding that partnership interests are securities when a partner has so little control over the management as to be a passive investor. *See Williamson v. Tucker,* 645 F.2d 404, 424 (5th Cir. 1981).

Limited partnerships in Delaware are formed pursuant to 6 Del.C. § 17–101 *et seq.* Limited partnerships are comprised of general partners and limited partners. General partners in limited partnerships have all the powers and duties of general partners in general partnerships, and are liable for the debts of the partnership. 6 Del.C. § 17–403(b). Limited partners have limited liability, but become liable as general partners if they take part in the control of the business. *See* 6 Del.C. § 17–303(a); Unif. Ltd. Partnership Act (1916) § 7, 6A U.L.A. 336 (1995). A limited partner may advise a general partner with respect to the business of the limited partnership, or cause a general partner to take action by voting or otherwise, without losing his limited liability. *See* 6 Del.C. § 17–303(b)(2). In cases involving transactions of interests in limited partnerships, wherein the limited partners exercised no managerial role in the partnership's affairs, courts treat the limited partners as passive investors, and find that the membership interests of limited partners constitute securities under federal law. *See, e.g., Mayer v. Oil Field Systems Corp.,* 721 F.2d 59, 65 (2d Cir.1983). Where, however, a limited partner is found to have exercised substantial control over the management of the partnership, courts find that the limited partner has not profited solely from the efforts of others, and rule that the interest in the partnership is not a security. *See, e.g., Steinhardt,* 126 F.3d at 153.

Membership interests in LLCs are distinct from interests in general partnerships and limited partnerships. The primary differences between LLCs and general partnerships are that members of LLCs are entitled to limited liability, and, depending on the terms of the operating agreement giving rise to the particular LLC at issue, the members of the LLC may be less involved in the management of the enterprise than partners in a general partnership. As such, the grounds for creating a per se rule, or at least a presumption, that interests in general partnerships are not securities are lacking in the context of LLCs.

In comparison with limited partnerships, the Delaware Limited Liability Company Act permits a member in an LLC to be an active participant in management and still

to retain limited liability. 6 Del.C. § 18–303. Thus, there is no statutory basis, as with limited partnerships, to presume that LLC members are passive investors entitled to protection under the federal securities laws.

The Delaware Limited Liability Company Act grants parties substantial flexibility in determining the character of an LLC. Accordingly, the terms of the operating agreement of each LLC will determine whether its membership interests constitute securities. The presumptions that courts have articulated with respect to general partnerships and limited partnerships do not apply to LLCs. Rather, to determine whether a member's profits are to come solely from the efforts of others, it is necessary to consider the structure of the particular LLC at issue, as provided in its operating agreement.

In the present case, the Members of NSC had no authority to directly manage NSC's business and affairs. Section 5.1(a) of the LLC Agreement states:

> Except as otherwise expressly set forth in this Agreement, the Members shall not have any authority, right or power to bind the Company, or to manage or control, or to participate in the management or control of, the business and affairs of the Company in any manner whatsoever. Such management shall in every respect be the full and complete responsibility of the Board alone as provided in this Agreement.

The Members, however, had the power to remove any Manager with or without cause, and to dissolve the company. Great Lakes exercised this authority on October 5, 1999, when it filed a Certificate of Cancellation with the State of Delaware, dissolving NSC as a separate entity. Moreover, Great Lakes' complaint avers that, prior to selling NSC, Monsanto and STI had the power to control the actions of the Managers, insofar as defendants allegedly prohibited NSC's management from speaking directly with Great Lakes regarding sales, sales forecasts, and customer orders.

The powers held by Great Lakes in NSC are comparable to those discussed in *Steinhardt*, 126 F.3d at 154, wherein the Third Circuit considered whether a limited partner in a limited partnership could state a claim under the securities laws. The limited partner, Steinhardt, purchased a 98.8% interest in the limited partnership, which acquired title to non-performing mortgage loans. The court noted that limited partners generally are passive investors entitled to protection under federal securities law. Upon analyzing the governance of the limited partnership at issue, however, the court found that Steinhardt alone constituted a "Majority of the Partners," and that Steinhardt was free to remove and replace the general partner without notice if the general partner refused to carry out Steinhardt's proposals. *See id.* at 154. In light of this factor and others, the court found that the limited partnership agreement at issue gave Steinhardt significant powers that directly affected the profits it received from the partnership. Accordingly, the court concluded that Steinhardt was not a passive investor, and that Steinhardt's membership in the partnership did not qualify as an investment contract.

The powers held by Great Lakes were comparable to those of Steinhardt, in that Great Lakes had the authority to remove NSC's managers without cause. Because Great Lakes was the sole owner of NSC, its power to remove managers was not diluted by the presence of other ownership interests. *See Williamson*, 645 F.2d at 423 (noting that a partner in a general partnership might be deemed to be a passive investor if there were a sufficient number of other partners to dilute the partner's voting rights). Great Lakes' authority to remove managers gave it the power to directly affect the profits it received from NSC. Thus, the court finds that Great Lakes' profits from NSC did not come solely from the efforts of others. *See Howey*, 328 U.S. at 299, 66 S.Ct. 1100.

#### ii. *sale of 100% of a business*

Alternatively, Great Lakes argues that, even if it did exercise substantial control over NSC, the transfer of Interests in NSC is nonetheless covered by the securities laws, because it bought 100% of the Interests in NSC and intended to operate the business. Great Lakes relies on *Landreth*, 471 U.S. at 681, 105 S.Ct. 2312, in support of this proposition.

Under *Landreth*, as discussed above, a stock transaction is covered by the securities laws even though the purchaser exercises control over the acquired corporation. *See id.* at 690, 105 S.Ct. 2312. *Landreth*, however, is applicable only to those cases involving stock, or other financial instruments which are listed in § 2(a)(1) of the Securities Act. *See id.* When the financial instrument in question is a less traditional instrument that is not enumerated in the statute, but that might qualify as an "investment contract," then the complainant must demonstrate that the instrument satisfies the *Howey* test. As discussed above, the Interests in NSC do not constitute stock, and so *Landreth* is inapplicable.

The court finds that Great Lakes did not invest in a common enterprise, and did not have an expectation of profits "solely from the efforts of others," as is required by *Howey*. The Interests in NSC, thus, are not investment contracts.

#### 5. Are the Interests in NSC "Any Interest or Instrument Commonly Known as a Security"?

Great Lakes argues that, even if the Interests in NSC do not otherwise satisfy the *Howey* test for investment contracts, they should be deemed to be "any interest or instrument commonly known as a security," as provided for in § 2(a)(1) of the Securities Act. Great Lakes notes that the LLC Agreement refers to the Interests at issue as "equity securities," and that the LLC Agreement prohibits the transfer of the Interests in such a way as would "violate the provisions of any federal or state securities laws." Moreover, Great Lakes contends, ten states have defined interests

in LLCs as securities, including Indiana, where NSC has its principal place of business.

Monsanto and STI contend that the Interests cannot be an "interest or instrument commonly known as a security," because the Interests in NSC do not satisfy the *Howey* test.

The Supreme Court has indicated that the term "any interest or instrument commonly known as a security" covers the same financial instruments as referred to by the term "investment contract." In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Court stated that "[w]e perceive no distinction, for present purposes, between an 'investment contract' and an 'instrument' commonly known as a 'security.' In either case, the basic test for distinguishing the transaction from other commercial dealings is 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'" *Id.* at 852, 95 S.Ct. 2051 (quoting *Howey*, 328 U.S. at 301, 66 S.Ct. 1100); *see also Landreth*, 471 U.S. at 692 n. 5, 105 S.Ct. 2312 (same). The *Howey* test, the Court explained, "embodies the essential attributes that run through all of the Court's decisions defining a security." *Forman*, 421 U.S. at 852, 95 S.Ct. 2051.

When confronted with novel financial instruments, numerous courts have considered whether to distinguish between an "investment contract" and "any interest or instrument commonly known as a security," and have declined to do so. *See, e.g., Procter & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270, 1282 (S.D.Ohio 1996) (declining to find that swaps constitute an "interest or instrument commonly known as a security"); *Crabtree Investments, Inc. v. Aztec Enterprises, Inc.*, 483 F.Supp. 211, 215 (M.D.La.1980) (declining to find that a continuing guaranty to secure loans was an "interest or instrument commonly known as a security"). In this case, too, the court finds that it would be

improper to extend the definition of a security by reinterpreting the term "any interest or instrument commonly known as a security."

In sum, the court finds that the Interests in NSC constitute neither "stock," nor an "investment contract," nor "any interest or instrument commonly known as a security." The court will grant defendants' motion to dismiss Count I of Great Lakes' complaint.

### C. Does the Court Have Jurisdiction Over Great Lakes' Remaining Claims?

Counts II through VIII of Great Lakes' complaint are based on alleged violations of state law and common law. Because the court will dismiss plaintiff's sole federal law claim, the court must dismiss plaintiffs' pendent state law claims for lack of jurisdiction. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### III. CONCLUSION

For the forgoing reasons, the court will grant defendants' motion to dismiss all counts of plaintiff's complaint. The court will issue an Order in accordance with this Opinion.