771 A.2d 487

AK'S DAKS COMMUNICATIONS, INC. et al.,

v.

MARYLAND SECURITIES DIVISION.

No. 689, Sept. Term, 2000.

Court of Special Appeals of Maryland.

April 27, 2001.

J.B. Grossman, LL.M. (Adorno & Zeder, Boca Raton, FL, Thomas D. Renda and Siskind, Grady, Rosen, Hoover & Levin of Baltimore, MD, on brief.) for appellants.

Lucy A. Cardwell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Timothy F. Cox, Asst. Atty. Gen. on the brief) Baltimore, MD., for appellee.

Argued before DEBORAH S. EYLER, KRAUSER, and WILLIAM W. WENNER, (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

On April 4, 1995, the Maryland Securities Division ("the Division"), appellee, issued a summary cease and desist order and initiated formal proceedings against Express Communications, Inc., Pendleton Waugh, Patricia T. Phipps, Charlie Mae Lewis, Ak's Daks Communications, Inc., SMR Advisory Group, Albert Koenigsberg, Warren Blanck, Puma Communication, Inc., David Meredith, Communication Consultants, Jerry Calloway, Manning Communications Consultants, David Evans, and David Smith.[1] On October 3, 1996, the Division issued a show cause order against Ak's Dak's Communications, Inc., SMR Advisory Group, L.C., Albert Koenigsberg,

---

1. On January 31, 1996, default judgments were entered against Express Communications, Inc., Pendleton Waugh, Patricia T. Phipps, Charlie Mae Lewis Communication Consultants, Jerry Calloway, David Evans, and David Smith, based on their failure to respond to the summary order or request a hearing.

and new respondent Jimmy Evans, charging them with violations of the original summary order to cease and desist.

The two cases were consolidated and a hearing was held before an Administrative Law Judge (the "ALJ") on November 18, 19, and 20, 1996, and January 27, 28, 29, 30, and 31, 1997. The ALJ issued findings and submitted them to the Maryland Securities Commissioner ("Commissioner").[2] The Commissioner held a hearing and thereafter determined that Ak's Daks Communications, Inc., SMR Advisory Group, L.C., Albert Koenigsberg, Jimmy Evans, Warren Blanck, Puma Communication, Inc., David Meredith, and Manning Communications Consultants, appellants, violated Maryland securities laws. He imposed a fine of $178,000.

Appellants filed an action for judicial review of the Commissioner's decision in the Circuit Court for Baltimore City. The circuit court (Berger, J.) affirmed the Commissioner's decision. The appellants now appeal to this Court, presenting the following questions for review, which we have rephrased:

I. Was the Commissioner legally correct in deciding that limited liability company interests sold to Maryland investors were investment contracts and, therefore, securities?

II. Was the evidence legally sufficient to support the Commissioner's decision that the appellants violated sections 11–301, 11–401, 11–402, and 11–501 of the Maryland Securities Act?

For the following reasons, we answer yes to both questions. Accordingly, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

### The Appellants

Ak's Daks Communications, Inc. ("Ak's Daks") is a Florida corporation that was organized on April 9, 1992. Albert

---

2. During the course of the proceedings, then—Commissioner Robert N. McDonald left his position as Securities Commissioner. The new Commissioner delegated to him the authority to continue to be the final decision-maker in this case.

Koenigsberg is its president and sole shareholder. Ak's Daks entered into contracts with each of the 55 limited liability companies ("the LLC's") involved in this case (as discussed below) to serve as their administrative agent. Pursuant to the contracts, Ak's Daks was responsible for the administrative and record-keeping needs of each of the LLCs.

SMR Advisory Group ("SMR Advisory") is a Florida limited liability company that was organized on March 10, 1994, by Koenigsberg, Warren Blanck, and Bobbi Chubirka. SMR Advisory is a founding member of each of the LLCs. SMR Advisory is a telecommunications strategic planning, engineering, and construction enterprise that was formed to operate specialized mobile radio ("SMR") systems in the 220–222 MHZ spectrum. It contracted with Ak's Daks to construct and manage 220–222MHz radio dispatch systems for the LLCs.

Warren Blanck is president of Unicall Communications, a membership recruiting organization for various of the LLCs. Unicall was founded by SMR Advisory.

Puma Communications, Inc. ("Puma Communications") is a membership recruiting organization for various of the LLCs. It was founded by SMR Advisory and is a Florida corporation. David Meredith is the president, sole shareholder, and employee of Puma Communications. Meredith also is a member of SMR Advisory.

Jimmy Evans is a member and employee of SMR Advisory.

### The LLCs & Their Formation

Each LLC was formed to offer SMR dispatch services from a particular location. The SMR dispatch services consist of a two-way radio system that allows one person to speak at a time. Forty-two of the LLCs are located on the west coast of the United States and are intended participants in the proposed Western Regional Network. If created, that network would provide uninterrupted SMR service to clients throughout the western range of the LLCs. Thirteen of the LLCs are located on the east coast.

The 220–222 MHZ SMR systems have limited capacity for general use in communications. This is because the technology necessary to permit a SMR system to operate as a two-way communications device has not yet been developed. Also, the narrow band width of the 220–222 MHZ frequency restricts the amount of information that can be transmitted and radio signals in the 220–222 MHZ range cannot penetrate buildings as effectively as 800 MHZ systems.

The LLCs all were organized by SMR Advisory and either one member of the public, an affiliate, or a holder of a 220 MHZ license from the Federal Communications Commission ("FCC"). For the LLCs in which Maryland residents invested, the other founding member either was an employee or owner of SMR Advisory, or was otherwise related to SMR Advisory or Koenigsberg. SMR Advisory received an 8% equity ownership interest in the "Class B" LLC interests. The holder of the FCC license received a 20% interest in the LLC and was required to transfer his license to the LLC. These original members entered into agreements to start the build-out of the SMR facility and then sought out other members "to provide additional capital and whatever other participation each additional LLC member deemed appropriate." The additional members were "Class A" members; upon completion of the build-out of the 220 MHZ operating system, the Class A members became Class B members, and the Class A interests ceased to exist. New members from the public also became Class B members.

Each LLC has, on average, 38 investors and each LLC has raised approximately $275,000 from those investors. Twenty-one Maryland residents invested a total of more than $161,000 in various of the LLCs. Nationwide, over 1100 people invested in the LLCs. Investor funds from all of the LLCs were pooled in a single bank account.

### Offering Materials

Investors were solicited through a variety of means, including radio commercials. Membership recruiters also solicited investors who previously had invested in wireless communica-

tions. Members were not sought on the basis of their technical or business expertise in the field, even though operating the 220–222 MHZ SMRs requires a technical understanding of the mobile radio field.

Membership recruiters promised potential investors a profitable outcome, telling one potential investor that a $7,500 investment could produce revenues of $50,000 to $60,000 in five years. The membership recruiters did not inform potential investors of the characteristics of the market, the site, or the projected earnings for the particular LLC involved. The recruiters arranged for Ak's Daks or SMR Advisory to send promotional material to the potential investors.

The offering materials prepared by Ak's Daks stated that Koenigsberg had 15 years of experience in FCC license and filing programs. It did not reveal that his experience was gained with a company whose president was convicted of federal crimes. The material also highlighted SMR Advisory as a major player in the wireless communications field. Potential investors were advised that SMR Advisory was to be the administrator of the offering and would provide various services, including: formation of the LLC, negotiation with $220\%_{222}$ MHZ license holders, coordination and execution of legal documents, provision of monthly newsletters to members and quarterly performance statements to clients, and compliance with FCC rules and regulations. The materials stated that SMR Advisory had operating company profit margins in excess of 28 percent.

The offering materials included a forecasted financial statement for the Western Regional Network. It projected that the LLCs on the west coast would have a combined net income of $10,181,100 in 1999 and a total net income for a five year period of $28,965,700. These figures average out to a net income of $18,148 on a $3,500 investment over a five year period. The offering materials also projected over $4,939,000 in interconnect revenues and over $1,600,000 in revenue from data transmission services for the Western Regional Network. The interconnect revenue projections contained in the materi-

als were fifteen times the projections made by the appellants' expert witness, Stephan Virostek, and were based upon estimations of rates and percentage of subscribers for interconnect services that were well-above industry averages.

The offering material included a document depicting the Western Regional Network as an interlocking network of SMR stations from north of Los Angeles to Seattle. The material described this as "a project underway to develop the largest seamless narrowband wireless network in the United States." The offering material did not mention the existence of the "forty mile rule," an FCC regulation that restricts common ownership of SMR systems in the same community. This regulation would thwart the appellants' plans for the Western Regional Network. The representations concerning this network and of the potential for high profit were important factors in some Maryland residents' decisions to invest.

The offering material also failed to inform investors of the characteristics of the market or projected earning for specific LLCs. The solicitation material contained some information on the promoters' financial interest in the investments, but did not reveal that 35% of the investment fund went to the membership recruiter and 12% of the investment fund went to Ak's Daks, and 25% of the gross income went to SMR Advisory. The offering materials further did not disclose that there were proceedings pending against these parties in South Dakota and Arizona. Potential investors were told that the LLCs were member-managed companies operated under the control of a majority vote of the members.

Upon receipt of the offering material, a potential investor would send a reservation form and money to Ak's Daks, thereby holding an investment in a particular LLC for the investor. Potential investors then were contacted by a compliance interviewing company that ran through a series of questions designed to elicit an acknowledgment by the investor that he was aware that the LLCs were member-managed companies, that his money was totally at risk, and that his liability was limited to the amount invested. The compliance

interview conducted with one Maryland investor contained approximately 25 questions and lasted between three and five minutes. Approximately 1% of potential investors were rejected as a result of the compliance interview process.

Membership summaries were sent to investors; the summaries contained copies of contracts that already had been entered into on behalf of the LLCs. The appellants gave the investor the right to rescind the investment up until seven days after the receipt of these summaries. If the investor chose to retain the investment, he or she was required to ratify the previously negotiated contracts.

No investment opportunity offerings in the LLCs were registered in Maryland as securities under the Securities Act. None of the appellants have registered in Maryland as a broker dealer or a broker dealer agent under the Securities Act. After the Commissioner issued the cease and desist order of April 4, 1995, the appellants continued to solicit Maryland residents to invest in the LLCs.

## Operation of the LLCs

Koenigsberg, SMR Advisory, and Ak's Daks negotiated all of the contracts for the LLCs. Koenigsberg signed all of the subscription agreements for the new members; he did not consult current members before accepting the new members. Koenigsberg signed nearly all of the contracts on behalf of the LLCs. He signed some of the contracts on behalf of both parties. On various occasions, Koenigsberg signed as "founding member," "officer" and "President/founder." Yet, he is not the founding member, president, or officer of any of the LLCs. Many of the contracts involving LLCs in which Marylanders invested were signed before the Maryland investors became members of the LLC; the Maryland investors had no input into the terms of these contracts. Eleven contracts were signed, after Maryland residents invested, between the LLCs that had Maryland members and Ak's Daks, SMR Advisory, the FCC licensee, or radio tower site owner. The investors had no say in the terms of these contracts.

SMR Advisory's contracts with the LLCs give it a broad range of authority. The contracts have five-year terms. Many provide that renewal of the contracts may not be unreasonably withheld, except for gross negligence or fraud. Other of the contracts with SMR Advisory and with Ak's Daks provide that renewal may not be unreasonably withheld.

SMR Advisory sent proxies to investors on various issues, requiring the investors to make business decisions for the LLCs. The proxies did not contain important technical and cost information, however, and some proxies asked the members to ratify decisions that already had been made.[3]

## DISCUSSION

### I

The appellants first contend that the Commissioner erred as a matter of law in determining that the interests in the LLCs that they offered and sold to investors were securities. Specifically, they argue that in analyzing the issue the Commissioner should have applied a presumption that interests in limited liability companies are not securities. The Division responds that the Commissioner was legally correct in its analysis and in concluding that the LLC interests were securities.[4]

---

3. For instance, SMR Advisory sent the LLC members proxies regarding the loading of the system with customers. The proxy asked the members to approve a payment of $3,500 per LLC. The proxy did not identify the company that would be providing the loading service and did not provide any terms of the contract other than the $3,500 fee.

4. The Division makes two additional arguments, neither of which we find to be applicable to the case at bar. First, the Division maintains that, under the doctrine of "law of the case" the Commissioner's determination that the appellants violated the order to show cause of October 3, 1996 controls the outcome of the issue before us. We do not believe that the doctrine of "law of the case" is properly applicable here, but, given our final determination on the merits of the matter, the issue is moot. The Division also argues that our review of this issue is barred by the doctrine of *res judicata*, because *Nutek Info. Sys. v. Arizona Corp. Comm'n*, 194 Ariz. 104, 977 P.2d 826 (Ct.App.1998), determined that the interests in these LLCs were securities. We do not

 We apply a *de novo* standard of review to legal determinations made by an administrative agency. *See Young v. Board of Physician Quality Assurance,* 111 Md.App. 721, 726, 684 A.2d 17 (1996), *cert. granted,* 344 Md. 568, 688 A.2d 447, *cert. dismissed,* 346 Md. 314, 697 A.2d 82 (1997). In ascertaining the propriety of an agency's legal conclusions, we must consider whether the agency recognized and applied the correct principles of law governing the case. *Id.* Our review is limited to the conclusions of law actually made by the agency, and we will affirm the agency's decision only if it is sustainable on the grounds given. *United Parcel Serv., Inc., v. People's Counsel,* 336 Md. 569, 585, 650 A.2d 226 (1994); *United Steelworkers v. Bethlehem Steel Corp.,* 298 Md. 665, 679–80, 472 A.2d 62 (1984).

Maryland Code (1999 Repl.Vol.), § 11–101(r) of the Corporations and Associations Article ("CA") defines a "security" as any

(i) note; (ii) stock; (iii) treasury stock; (iv) bond; (v) debenture; (vi) evidence of indebtedness; (vii) certificate of interest or participation in any profit-sharing agreement; (viii) collateral-trust certificate; (ix) preorganization certificate or subscription; (x) transferable share; (xi) investment contract; (xii) voting-trust certificate; (xiii) certificate of deposit for a security; (xiv) certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease; (xv) in general, any interest or instrument commonly known as a "security"; or (xvi) Certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or war-

---

need to address the *res judicata* issue, because we reach the same result on the merits of the issue as the Arizona court did. We further note that in order for the principle of *res judicata* to apply, the parties must be the same or in privity with the parties to the earlier case. *FWB Bank v. Richman,* 354 Md. 472, 731 A.2d 916 (1999). Here, the Maryland Securities Division was not a party to the original suit and was not in privity with a party to that suit; while the Maryland Securities Division and its Arizona counterpart may share similar interests, they are not the same party and are not in privity.

rant or right to subscribe to or purchase any of the preceding.

This definition is substantially the same as the federal definition of a "security" under the Securities Act of 1933 § 2(1), 15 U.S.C. § 77b (a)(1) (1997), and is to be interpreted in a manner that is consistent with the federal definition. CA § 11–804. *See also O'Neil v. Marriott Corp.*, 538 F.Supp. 1026, 1032 (D.Md.1982); *Caucus Distribs., Inc. v. Maryland Sec. Comm'r*, 320 Md. 313, 324, 577 A.2d 783 (1990). For that reason, we will rely in large part on federal case law in interpreting the term "security."

The Commissioner found that the LLC interests met the "investment contract" definition of a security. Although an "investment contract" is not further defined by Maryland or federal securities law or regulations, its meaning has been explained by the United States Supreme Court in the seminal case of *Securities and Exchange Commission v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). There, the Court held that an investment contract, within the meaning of the federal securities laws, is an investment of money in a common enterprise with an expectation of profits derived solely from the efforts of others. The Court explained:

The term "investment contract" is undefined by the Securities Act or by relevant legislative reports. But the term was common in many state "blue sky" laws in existence prior to the adoption of the federal statute and, although the term was also undefined by the state laws, it had been broadly construed by state courts so as to afford the investing public a full measure of protection. Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 56, 177 N.W. 937, 938. This definition was uniformly applied by state courts to a variety of situations where *individuals were led to invest money in a common enterprise with the expectation that they would earn a*

*profit solely through the efforts of the promoter or of some one other than themselves.* By including an investment contract within the scope of § 2(1) of the Securities Act, Congress was using a term the meaning of which had been crystallized by this prior judicial interpretation.... It embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*Id.* at 298–99, 66 S.Ct. 1100 (footnote omitted) (emphasis added). *See also Reves v. Ernst and Young,* 494 U.S. 56, 64, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (stating that *Howey* provides the method for determining if an instrument is an "investment contract"); *Teague v. Bakker,* 35 F.3d 978, 986 (4th Cir.1994), *cert. denied,* 513 U.S. 1153, 115 S.Ct. 1107, 130 L.Ed.2d 1073 (1995) (stating that an investment contract exists when there has been (1) an investment of money in (2) a common enterprise with (3) an expectation of profits derived solely from the efforts of others).

The parties do not dispute that the sale of an interest in a limited liability company satisfies the first two factors of the *Howey* definition of an investment contract. The only issue in this case is whether, under the final *Howey* factor, the investors in the LLCs expected profits to be derived solely from the efforts of others.[5] There is a long line of factual cases interpreting this prong of the *Howey* definition of an investment contract.

■ In determining if an investor expects profits solely from the efforts of others, the courts have interpreted the word "solely" with some flexibility, so as to further the purpose of the securities laws and ensure that they are not easily

---

**5.** The *Howey* test has sometimes been characterized as a three part test and sometimes as a four part test. This is a matter of phrasing only and does not involve any substantive differences. *Compare Reves,* 494 U.S. at 64, 110 S.Ct. 945 (phrasing the *Howey* test as a four part test) *with Teague,* 35 F.3d at 986 (phrasing the *Howey* test as a three part test). In the case at bar, the only dispute involves, under either version, the last prong of the *Howey* test.

circumvented. *Long v. Shultz Cattle Co.*, 881 F.2d 129, 133 (5th Cir.1989); *SEC v. Glenn W. Turner Enter.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). These cases restate the inquiry in terms of whether the efforts made by those other than the investor are the undeniably significant managerial and entrepreneurial efforts. *Teague*, 35 F.3d at 986 n. 7 (citing *Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918, 920 (4th Cir.1990)); *SEC v. International Loan Network, Inc.*, 297 U.S.App. D.C. 22, 968 F.2d 1304, 1308 (1992); *Bailey*, 904 F.2d at 920–21; *Long*, 881 F.2d at 133; *SEC v. Aqua–Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d. Cir.), *cert. denied sub nom. Hecht v. SEC*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982); *Glenn W. Turner Enters.*, 474 F.2d at 482–83.[6] Thus, minimal efforts by the investor will not preclude an interest from being classified as an investment contract.

■ The cases take a fact-driven approach to determining whether managerial efforts by those other than the investor are the significant efforts. They emphasize the economic realities of the transaction over the actual form of the transaction. *International Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *United Hous. Found. v. Forman*, 421 U.S. 837, 851–52, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Howey*, 328 U.S. at 298–99, 66 S.Ct. 1100; *Waterman v. Alta Verde Industries*, 643 F.Supp. 797, 804–05 (E.D.N.C.1986), *aff'd*, 833 F.2d 1006 (4th Cir.1987). The investors must have an actual, practical ability to exercise management rights and control over the business. *Howey*, 328 U.S. at 299–300, 66 S.Ct. 1100.

---

**6.** In *United Hous. Found. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Supreme Court noted that the Ninth Circuit had held that the term "solely," as used in the *Howey* test, should not be interpreted literally. The Court declined to say whether it would adopt that formulation of the *Howey* test. *Id.* at 852 n. 16, 95 S.Ct. 2051. Four years later, in *International Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), the Court, quoting *Howey*, retained the term "solely" in its formulation of the test. In 1990, in *Reves*, the Court omitted the term "solely" from its formulation of the *Howey* test. *Reves*, 494 U.S. at 64, 110 S.Ct. 945.

█ In the case at bar, the Commissioner's analysis of the nature of the interests in the LLCs touched upon the form of the entity, the power delegated to the members by the membership and management agreements, and, most importantly, the economic realities of the members' interest in the LLCs. In its economic realities analysis, the Commissioner noted that the SMR industry is highly technical and complex; the investors lacked experience in the SMR field; the investors were solicited via radio commercials and telemarketing; the investors were asked to make decisions only on minor issues; many of the "decisions" that the investors were asked to make actually were ratifications of decisions that already had been made; the investor members were not consulted before new members were accepted into the LLCs; and the investors were completely dependent upon SMR Advisory and Ak's Daks. This is precisely the type of fact-oriented analysis that is required to determine the economic realities of the investors' interest.

The appellants argue that *Williamson v. Tucker*, 645 F.2d 404, (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), supports their position that, by failing to apply a strong presumption that the interests were not securities, the Commissioner incorrectly applied the law in determining that the interests in the LLCs were securities. In *Williamson*, the Fifth Circuit adopted a narrow exception to the standard economic realities approach. The appellants assert that it is this rule that governs the case at bar.

In *Williamson v. Tucker, supra*, 645 F.2d 404, the Court held that in analyzing the third *Howey* factor in the context of general partnership business entities, there is a strong, yet rebuttable, presumption that general partners do not rely solely on the efforts of others for profit and, therefore, general partnership interests do not fall within the scope of "investment contracts" and are not securities. *Id.* at 422–23; *see also Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236 (4th Cir.1988).

The rationale for the *Williamson* presumption is that general partners have a legal right to participate in the manage-

ment and control of the partnership and can promote its success through their efforts, and that even if they delegate their actual authority, they retain the apparent authority to bind the partnership. In addition, general partners remain liable for the acts of the partnership; therefore, they cannot expect to be passive investors who derive profits solely from the efforts of others. *Williamson,* 645 F.2d at 421–22; *Great Lakes Chem. Corp. v. Monsanto Co.,* 96 F.Supp.2d 376, 391 (D.Del.2000). "These factors critically distinguish the status of a general partner from that of the purchaser of an investment contract who in law as well as in fact is a 'passive' investor." *Williamson,* 645 F.2d at 421, (quoting *New York Stock Exchange, Inc. v. Sloan,* 394 F.Supp. 1303, 1314 (S.D.N.Y.1975)).

The Court in *Williamson* also set forth a three-part test for determining when the presumption—that a general partnership interest does not meet the third prong of *Howey* and is not a security—has been overcome. This test provides that if "the partner has irrevocably delegated his powers, or is incapable of exercising them, or is so dependent on the particular expertise of the promoter or manager that he has no reasonable alternative to reliance on that person, then [the] partnership powers may be inadequate to protect [the partner] from the dependence on others which is implicit in an investment contract." *Williamson,* 645 F.2d at 422–23.

Other courts have addressed whether the *Williamson* presumption for general partnerships applies to interests in limited liability companies. In *Great Lakes Chemical Corporation v. Monsanto Company, supra,* 96 F.Supp.2d 376, the court was asked to decide whether interests in a limited liability company were securities and, thus, whether the sale of those interests was governed by federal securities law. The court compared the general partnership form of business entity and the limited liability company form of business entity. It noted that the two forms do share some of the same characteristics. *Id.* at 391. Like general partners, members in a limited liability company may participate actively in the management

and control of the business.[7] *Id.* The court concluded, however, that the factors distinguishing limited liability companies from general partnerships are significant. *Id.* at 383. Unlike general partners, members in a limited liability company are not personally liable for the obligations of the company solely by virtue of their membership in the company. Rather, their liability is limited, like the liability of shareholders. *Id. See also* CA § 4A–301. Further, depending on the nature of the particular limited liability company's operating agreement, the members also may be less involved in the management of the business than general partners are. *Great Lakes Chem. Corp.,* 96 F.Supp.2d at 391. *See also* CA § 4A–401. Based on these distinctions, the court declined to extend the *Williamson* presumption, that interests in general partnerships are not securities, to interests in limited liability companies.

In *Nutek Info. Sys. v. Arizona Corp. Comm'n,* 194 Ariz. 104, 977 P.2d 826 (Ct.App.1998), *cert. denied sub nom. Ak's Daks Communications, Inc. v. Arizona Corp. Comm'n,* 528 U.S. 932, 120 S.Ct. 332, 145 L.Ed.2d 259 (1999), this same issue was again addressed, this time by the Arizona court.[8] The Arizona Court of Appeals undertook substantially the same analysis as did the United States District Court for the District of Delaware in *Great Lakes Chemical Corporation.* It compared the characteristics of general partnerships and limited liability companies and concluded that the distinctions between the two business forms militated against extending the strong presumption that general partnership interests are not securities to limited liability companies. *Nutek Info. Sys.,* 977 P.2d at 833–34.

Some courts have reached the opposite conclusion, however, and have extended the *Williamson* presumption to interests in limited liability companies. Those courts start from the premise that an interest in a limited liability company is not a

---

**7.** Under CA § 4A–401, each member of a limited liability company is an agent of the company, unless the articles of organization or the operating agreement states otherwise.

**8.** This is the "companion" case to the case at bar.

security and apply the factors set out in *Williamson* to determine whether that presumption is overcome. Yet, those cases have extended the *Williamson* presumption to limited liability companies with little or no discussion of the distinctions between general partnerships and limited liability companies. *See Tschetter v. Berven,* 621 N.W.2d 372 (S.D.2001); *SEC v. Shreveport Wireless Cable Television Partnership,* [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 90,322, 1998 WL 892948 (D.D.C.1998).

 We believe that the better approach to this issue is the one taken by the courts in *Great Lakes Chemical Corporation* and *Nutek Information Systems.* In *Williamson,* the court cited a general partner's liability for the obligations of the partnership and his right to control the business and the general partner's extensive control over the business as being the "critical factors" to distinguishing a general partnership interest from an investment contract. 645 F.2d at 421. Because limited liability companies ordinarily do not share these characteristics, there is no justification for a broad presumption against interests in limited liability companies being investment contracts. Extending the *Williamson* presumption for general partnership interests to interests in limited liability companies is not appropriate, given the essential distinctions between the two business forms. *See Great Lakes Chem. Corp.,* 96 F.Supp.2d at 391–92. We eschew a presumption that interests in limited liability companies are not investment contracts, within the meaning of the securities laws, and conclude that the Commissioner applied the proper legal standard for determining whether the interests in the LLCs in this case were securities.

## II

 The appellants contend that there was insufficient evidence to support the Commissioner's finding that they violated the anti-fraud provisions of section 11–301 of the Maryland Securities Act.[9] The Division responds that this

---

9. Although the appellants' question presented on this issue refers to all of the provisions that they were found to have violated—sections 11–

issue was not preserved for review and that even if it was, the evidence was sufficient to support the Commissioner's findings.[10]

Ordinarily, we will not decide an issue unless it plainly appears to have been raised in and decided by the lower court. Md. Rule 8–131. The Division contends that at the circuit court level, the appellants did not question the sufficiency of the evidence to support the Commissioner's findings of fraud. In their written papers in the circuit court, the appellants stated:

> A reading of the Commission's recommended findings supporting the Commission's finding of fraud, though, tracks Mr. Hatfield's statements. Further, the Commission's statements as to fraud have no support in any of the other witnesses testimony. Thus, the only witness to claim fraud was the only witness not to participate in the investment, and who had a bias against the investment's success.

We will view this as an assertion that there was insufficient evidence to support the Commissioner's finding of fraud. Thus, the issue was properly preserved for appeal. Md. Rule 8–131.

■■■ Section 11–301 of the Maryland Securities Act provides:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to: (1) Employ any device, scheme, or artifice to defraud; (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) Engage in any act,

---

301, 11–401, 11–402 and 11–501 of the Securities Act—their position focuses only on the sufficiency of the evidence to support the Commissioner's finding of fraud. Of the four provisions above, only section 11–301 prohibits fraud in connection with the sale or purchase of a security.

**10.** The appellants did not respond in their reply brief to the Division's assertion that this argument was not preserved for review.

practice, or course of business which operates or would operate as a fraud or deceit on any person.

The Commissioner found that the appellants violated subsection two of this statute in five ways. First, they failed to clarify for investors the interrelationship between Ak's Daks, SMR Advisory, the membership recruitment companies, and the compliance interviewing company. Second, they did not inform investors that money intended for investment in one LLC site could be switched to an entirely different site. Third, they overestimated the potential for profit from the interconnect revenues and misrepresented the fees that were to be paid to Ak's Daks, SMR Advisory, and the recruiters. Fourth, the offering materials that the appellants provided to potential investors did not explain the risks posed to the LLCs by orders against the appellants in South Dakota and Arizona. Finally, the appellants failed to inform investors of the existence of the "forty mile rule," which prohibits the construction of the proposed Western Regional Network.

 In essence, appellants' challenge to the sufficiency of the evidence is that the testimony of Dale Hatfield was biased and "patently not credible" and because Mr. Hatfield's testimony "was the sole basis for the Commission's fraud finding, those findings are unsupported by the record." [11] In determining whether an agency's decision is supported by sufficient evidence, we apply a substantial evidence standard. *Caucus Distribs., Inc.*, 320 Md. at 323–24, 577 A.2d 783; *Beeman v. Department of Health & Mental Hygiene*, 105 Md.App. 147, 155, 658 A.2d 1172 (1995). Under that standard, we determine whether a reasonable mind could have reached the factual conclusion reached by the Commissioner. *Caucus Distribs., Inc.*, 320 Md. at 324, 577 A.2d 783.

The Commissioner made over 135 findings of fact to support his decision. Of the findings of fact that are relevant to

---

11. By stipulation of the parties, the evidence adduced at the hearing involving these appellants before the Arizona Corporation Commission was made a part of this proceeding. That evidence included the testimony of Dale Hatfield.

whether the appellants violated § 11–301 of the Maryland Securities Act, only one expressly relied upon the testimony of Mr. Hatfield to any extent.[12] That finding involved the Commissioner's determination that the appellants violated CA § 11–301 by overestimating the amount of interconnect revenues and anticipated profit to potential investors. The Commissioner's finding did not rest solely on the testimony of Mr. Hatfield, however, but also relied upon the testimony of the appellant's expert witness, Stephen Virostek.[13] Mr. Virostek testified that the number of subscribers estimated in the offering materials was nearly twice his projection and that the interconnect revenue estimates in the offering material were fifteen times greater than his projection. Mr. Virostek also testified that the estimation, contained in the offering materials, that 50 percent of the total subscribers to the LLCs' services would be using the interconnect services was higher than industry averages and that 25 percent was more in line with the industry average. This evidence would allow a reasoning mind to reach the factual conclusion reached by the agency. Thus, the evidence was sufficient, even without Mr. Hatfield's testimony, to support the Commissioner's finding that the appellants overestimated the potential for profit from the interconnect revenues.

The appellants also assert that there was insufficient evidence to support the Commissioner's finding that they committed fraud by failing to provide potential investors with the risk factors prior to their receipt of the membership summaries. They state that the testimony of the individual investor witnesses shows that the risks were discussed before that time and were reiterated in the membership summaries.

---

**12.** In fact, the Commissioner made very little use of Mr. Hatfield's testimony, referring to it in support of only 6 of the 137 findings of fact.

**13.** Mr. Virostek's testimony was given in the Arizona proceeding and, like the testimony of Mr. Hatfield, was admitted in this proceeding by stipulation of the parties.

█ Under Md. Rule 8–501(c), the record extract filed in this Court must "contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal. . . ." When an appellant raises a sufficiency of the evidence argument, the portions of the record that are material to the issue must be included in either the record extract or an appendix to the brief. *Sawyer v. Novak,* 206 Md. 80, 84, 110 A.2d 517 (1955).

█ In the case at bar, the appellants did not include evidence in the record extract to support their assertion that the testimony of investor witnesses shows that risks were discussed prior to the membership summaries. They provide no citations to the transcript of the hearing or to any other part of the record itself that would support their position. We are not required to ferret out from a voluminous record information the appellants should have included in the record extract. *HEK Platforms & Hoists, Inc. v. Nationsbank,* 134 Md.App. 90, 98–101, 759 A.2d 293 (2000) (noting that the Court would be well within its discretion to dismiss the case under Md. Rule 8–501(m) because of the deficient record extract, but reaching the merits because the appellant had at least provided citations to the transcript to aid the Court); *Eldwick Homes Ass'n v. Pitt,* 36 Md.App. 211, 373 A.2d 957, *cert. denied,* 281 Md. 736 (1977) (dismissing the case for failure to include necessary information in the record extract). Accordingly, the appellants waived this issue for consideration. *Davis v. Davis,* 97 Md.App. 1, 24, 627 A.2d 17 (1993), *aff'd,* 335 Md. 699, 646 A.2d 365 (1994); *Mitchell v. State,* 51 Md.App. 347, 357–58, 443 A.2d 651, *cert. denied,* 459 U.S. 915, 103 S.Ct. 227, 74 L.Ed.2d 180 (1982).

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**