REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 512

September Term, 2014

MICHAEL DIFFENDAL, ET AL.

v.

DEPARTMENT OF
NATURAL RESOURCES, ET AL.

Eyler, Deborah S.,
Meredith,
Rodowsky, Lawrence F.
    (Retired, Specially Assigned),

        JJ.

Opinion by Eyler, Deborah S., J.

Filed: April 6, 2015

This appeal arises from the final decision of the Maryland Department of Natural Resources ("DNR") to deny an application for an aquaculture lease for three areas in the Chincoteague Bay in Worcester County. The DNR's decision was reversed on judicial review in the Circuit Court for Anne Arundel County.

The appellants are 18 individuals (and one joint trust established by two of these individuals) who are nearby residents, property owners, and commercial watermen, and who filed petitions of protest with the DNR and participated in the proceedings below.[1] The appellees are Donald Marsh, Jr., the applicant for the lease, and the DNR.

In three briefs,[2] the appellants present ten overlapping questions, which we have combined, condensed, and rephrased as two:

I. Was the DNR's decision that the lease application was for a "submerged land lease," not a "water column lease," legally correct and supported by substantial evidence in the record?

II. Was the DNR's decision that the public trust doctrine required it to consider the impact of the proposed lease on navigation and fishing in the area legally correct, and, if so, was the finding that negative effects on navigation and fishing justified denial of the lease supported by substantial evidence in the record?

For the following reasons, we shall affirm the judgment of the circuit court.

---

[1] The appellants are: The Michael Thomas Diffendal and Ellen Louise Diffendal Joint Irrevocable Trust; Michael Diffendal; Ellen Diffendal; Gunnar Zorn; Pamela Zorn; Peter Zerhusen; Cecilia Zerhusen; Frank Lang; Carol Lang; Gerald Bobeczko; Mary Jo Bobeckzco; Francis Harvey; Kristyn Harvey; John Harrison; Karen Harrison; Kirk Stewart; Jason Mumford; Sylvia Tunis; and Alexander Shandrowsky.

[2] Tunis and Shandrowsky each filed a separate brief on appeal. The remaining sixteen individual appellants and the trust filed a joint brief. We shall refer to the latter group of appellants collectively as Diffendal.

# FACTS AND PROCEEDINGS

## A. Aquaculture Leases in Maryland

Title 4 of the Natural Resources Article ("NR") governs "Fish and fisheries." Subtitle 11A pertains to "Aquaculture," which is "the commercial rearing of fish or aquatic plants for sale, trade, barter, or shipment." Md. Code (1973, 2012 Repl. Vol.), § 4-11A-01(b) of the NR Article. In enacting subtitle 11A, the General Assembly intended to "promote the development of an aquaculture industry in [Maryland]" and to streamline the procedure for applying for aquaculture leases. *See* NR § 4-11A-03(b) & (c) (addressing legislative intent). Since July of 2011, the DNR has been the agency charged with reviewing and deciding whether to grant all aquaculture lease applications.[3]

The DNR issues two types of aquaculture leases: water column leases and submerged land leases. NR § 4-11A-01(d). A water column lease is "a lease of the column of water on or under the surface of the water and above the surface of the submerged land." NR § 4-11A-01(p). A submerged land lease is a lease of "any land lying beneath the waters of the State . . . for cultivating oysters and other shellfish for commercial purposes." NR § 4-11A-01(n).

---

[3]Before July of 2011, the DNR and the Maryland Department of Environment ("MDE") shared this responsibility, with the DNR reviewing submerged land lease applications and the MDE reviewing water column lease applications. *See* 2011 Md. Laws, ch. 411 (making the DNR the agency in charge of reviewing all aquaculture lease applications).

2

A person or entity seeking an aquaculture lease must file an application with the DNR and pay a non-refundable fee. NR § 4-11A-09(a). The DNR, in conjunction with the MDE, other internal agencies, and the United States Army Corps of Engineers ("USACE"), conducts an extensive review to determine if the relevant statutory criteria are satisfied. Most of the statutory criteria for water column and submerged land leases are identical. For both, the DNR may issue a lease in waters that have been classified by the MDE as "approved, conditionally approved, or restricted for harvest." NR §§ 4-11A-07(b)(1) (submerged land lease); 4-11A-08(b)(1) (water column lease). The DNR may not issue either such lease if the areas proposed to be leased are:

(i) Within a minimum of 50 feet of shoreline or any pier without the written permission of the riparian owner at the time of initial application for the lease;
(ii) Within 150 feet of the public shellfish fishery or a registered pound net site;
(iii) Within 150 feet of any oyster reserve or a Yates Bar located in an oyster sanctuary;[4]
(iv) Within 150 feet of a federal navigational channel;
(v) Subject to paragraph (2) of this subsection, in any creek, cove, bay, or inlet less than 300 feet wide at its mouth at mean low tide;
(vi) In an SAV Protection Zone;[5] or
(vii) In a setback or buffer from the Assateague Island National Seashore established by the [DNR].

---

[4] A "Yates Bar" is "any submerged oyster bar, reef, rock, or area represented as an oyster bar on the charts of the Oyster Survey of 1906 to 1912, not including any amendments." NR § 4-11A-01(q).

[5] An "SAV Protection Zone" is "an area of submerged aquatic vegetation as mapped in aerial surveys by the Virginia Institute of Marine Sciences in 1 or more of the 5 years preceding the designation of an Aquaculture Enterprise Zone or an application for a lease under this subtitle. NR § 4-11A-01(m).

NR §§ 4-11A-07(c) (submerged land lease); 4-11A-08(c) (water column lease).

For submerged land leases in any of the coastal bay areas, the DNR may "establish submerged land areas . . . that . . . [a]re preapproved for leasing; . . . [that m]ay not be leased; [or that m]ay be approved for leasing only on specific application and review by the [DNR]." NR § 4-11A-08(e)(1). Before preapproving areas for leasing or prohibiting leasing in a given area, the DNR "shall consider potential conflicts presented by other uses of the proposed area, including navigation, recreation, and commercial fishing." NR. § 4-11A-08(e)(2).

For both water column leases and submerged land leases, if the DNR determines that all the statutory criteria are met and the proposed lease is not within an area preapproved for leasing, the proposed lease area must be staked and notice of the proposed lease must be advertised. NR § 4-11A-09(g). At that time, interested persons may file to protest the issuance of the lease. A protestant may request a contested case hearing. *Id*. If no protest is filed or if a final decision is issued dismissing the protest, the DNR shall issue the lease, with or without conditions, unless it finds the lease application should be denied "for reasonable cause" in order to protect "the public health, safety, or welfare." NR § 4-11A-09(d)(4). Once a lease is issued, it may be terminated by the DNR at any time for a violation of the subtitle.

A submerged land leaseholder "may cultivate shellfish on the submerged land, in temporary protective enclosures approved by the [DNR] on the surface of the submerged land, or in any other manner authorized by the [DNR]." NR § 4-11A-08(d). A water column

4

leaseholder may cultivate shellfish "[s]ubject to approval by the [USACE], on or under the surface of the water in a floating structure; or . . . [i]n any other manner authorized by the [DNR]." NR § 4-11A-08(d). A leaseholder may not exclude others from leased areas during the term of the lease, but non-leaseholders are prohibited from removing and/or destroying shellfish or equipment from the leased areas. *See* NR § 4-11A-16(b).

## B. Marsh's Lease Application

On March 30, 2009, Marsh filed his application for a shellfish aquaculture lease with the MDE. The application was transferred to the DNR following the change in the law noted above. Marsh sought to lease three 16-acre areas of the water column in Chincoteague Bay for the purpose of raising oysters in cages. He also sought to lease the submerged land below the water column in those same areas for raising clams in the substrate. Marsh amended his application to withdraw the request to lease the submerged land for clam cultivation and his application was treated as a water column lease application from that point forward.

Marsh's proposal for the water column lease was as follows. He planned to raise the oysters "from seed in cages made of plastic-coated wire mesh." Each cage would be 2 feet wide, 4 feet long, and about 6 inches deep. The cages would rest on between 2-inch to 6-inch "semi-cylindrical feet" sitting on the bottom of the bay. "Helical anchor bolts" would be drilled into the substrate to a depth of about 3 feet and the cages would be tethered to the anchors with nylon rope. The oysters would be inside bags inside the cages until they

5

reached a certain size, when they would be removed from the bags. Marsh planned to begin operations with 500 cages and then expand if his business was successful.

All three proposed lease areas were located about one mile south of South Point, which is the southernmost point of a peninsula that juts into the coastal bays south of Ocean City and to the west of Assateague Island. To the east of the peninsula is Sinepuxent Bay, to the west is Newport Bay, and to the south is Chincoteague Bay. All three are classified as "Atlantic Coastal Bays." NR § 4-11A-01(e). A few miles south of South Point are the South Point Shoals, a natural sandbar that extends several miles south. Between South Point and the shoals the water ranges in depth from 2 feet to 6 feet. A federal navigational channel maintained by the USACE runs in a generally north-south direction to the east of the peninsula and to the west of Assateague Island.

South Point also is the name of a residential community on the peninsula comprised of about 400 homes. Most of the waterfront homes in the community had docks and piers until Superstorm Sandy damaged and destroyed them in October 2012. The residents use the coastal bay area for recreation, including sailing, kayaking, and motor-boating.

Commercial fishermen also frequent the area in the spring and summer. As many as 15 to 20 commercial boats may be in the area at any given time during the height of the season. Fishermen navigating from the federal navigational channel to the east of South Point to Newport Bay to the west use an east-west channel of deeper water between South Point and the South Point Shoals. They refer to this channel as "the drain."

The review of Marsh's application took more than three years. It was reviewed by the DNR, MDE, the USACE, and various internal agencies. During the course of the review, Marsh made additional amendments to his application, to address concerns related to navigation in the area. In each amendment he reduced the size of the proposed lease areas and moved them farther from the shore of South Point. A public hearing was advertised and held following each amendment to the lease application.

In January of 2012, at the request of the DNR, USACE conducted a bathymetric survey[6] to identify and chart a 60-foot wide east-west "best water route" south of South Point and north of the proposed lease areas.[7] This route, which the DNR calls the "fairway," ranged in depth from six feet to four and one-half feet. As a result of these findings, Marsh amended his application once again, to ensure that none of the lease areas would infringe on the fairway. As revised, the proposed lease areas were at least 120 feet south of the fairway.[8] The three proposed areas were, from east to west, 10.23 acres, 3.41 acres, and 5.13 acres, respectively. The water depth in these areas was approximately 4 feet. A final public hearing on Marsh's revised lease application was held on July 10, 2012.

---

[6]A bathymetric survey is a measurement of water depths in a given area using SONAR.

[7]The survey was requested in response to concerns raised at the public hearings by residents of South Point and by commercial fishermen.

[8]The easternmost lease area was 844 feet west of the federal navigational channel.

7

Thereafter, the lease sites were marked and the DNR conducted its standard internal review. It found that the easternmost (and largest) lease site was more than 1,300 feet from the shore at its closest point; that the middle (and smallest) lease site was more than 2,300 feet from shore; and that the westernmost lease site was about 1,700 feet from shore. There was 846 feet between the westernmost and middle sites and 1,091 feet between the middle and the easternmost sites. The DNR also determined that the proposed lease locations all were in areas classified as approved by the MDE for shellfish cultivation and that they satisfied all seven criteria in NR section 4-11A-08(c). Finally, the DNR determined that there was no reasonable cause to deny the lease to protect the public health, safety, or welfare.

On August 9 and 16, 2012, the DNR published a notice of the proposed lease on its website and in the *Worcester County Times*. On August 20, 2012, it mailed notices to property owners with homes within a certain distance of the lease areas and to other interested persons. Between September 14 and September 24, 2012, the DNR received 50 protests from 98 individuals and the trust. Several protestants requested a contested case hearing. The DNR forwarded all the protests to the Office of Administrative Hearings ("OAH") and delegated to it the authority to make the final agency decision.

## C. The Contested Case Hearing

8

An Administrative Law Judge ("ALJ") with the OAH presided over the contested case hearing, which began on October 1, 2012, and lasted three days. Thirty protestants, including all of the appellants, participated and/or were represented by counsel at the hearing.

The DNR called one witness: Karl Roscher, the director of its Aquaculture Division and its Aquaculture Coordinator. Roscher testified generally about the application process for aquaculture leases and specifically about the review of Marsh's application. He explained that Marsh's application was for a water column lease because he was proposing to raise oysters above the submerged land. He stated that the lease application met all the statutory criteria and that the DNR did not perceive any concerns that would justify its denial. Rather, the DNR concluded that the leases would have "minimal impact on the other uses of the area."

Marsh testified on his own behalf. He explained the nature of his lease application, as discussed above. He further testified that he had measured the water depth in the proposed lease areas himself and those measurements showed that the clearance between the tops of the cages and the surface of the water would be at least 3 feet at low tide.

Seven residents of South Point, one former resident and current property owner, and three commercial fishermen testified in opposition to the proposed lease. Two of the commercial fishermen were accepted by the ALJ as experts in navigation and navigability.

The commercial fishermen testified about their experiences using the east-west fairway south of South Point and north of the proposed lease areas. They referred to the

fairway as "the channel" or "the drain." Jason Mumford, who was accepted as an expert in navigation, testified that Superstorm Sandy had caused the sand on the bottom of the Chincoteague Bay to move and, as a result, the depth measurements taken by the USACE no longer were accurate. He opined, moreover, that navigating a large commercial fishing boat through a 60-foot channel is difficult to impossible in rough water. He explained that, if he attempted to navigate over the lease areas, he would risk catching his motor on the cages and causing damage to his boat and to Marsh's gear.

Another commercial fisherman, Kirk Stewart, testified that the width of the deeper channel as represented on the USACE's bathymetric chart was incorrect and that the deeper part of the channel was much narrower. He further testified that he would have difficulty navigating through the channel if the lease were granted.

Nearby residents and property owners testified about their use of the waters south of South Point for recreational boating and other watercraft. They complained that navigating between South Point and the South Point Shoals was difficult because of shallow water and because there were hundreds of crab pots on the bottom. The crab pots generally extended about 20 inches from the bottom. Residents testified that they had run aground on many occasions and that they had hit crab pots. The residents all expressed the belief that navigating over the lease areas would be unsafe and that navigating around them would be extremely difficult, if not impossible.

### D. The Agency Decision

On February 20, 2013, the ALJ filed his decision on behalf of the OAH, which became the final agency decision. The ALJ made 59 detailed findings of fact about South Point, the coastal bay near South Point, the nature of Marsh's lease application, and the use of the waters near the proposed lease areas. Most of these facts were undisputed. As relevant here, the ALJ found:

9. The water to the south and southwest of South Point is shallow, but varies in depth. Directly off shore is a shallow area (approximately two feet deep) that extends out for several hundred yards. Beyond this is a narrow deeper (meaning four to five feet) section that is sometimes called a drain or channel. Beyond this deeper water is South Point Shoals, where the water again becomes shallow. This shallow area extends south in Chincoteague Bay for a mile or more.

10. The federal navigation channel runs through South Point Shoals, but is not well-maintained in that area.

* * *

12. During low tide, brisk north (including northwest and northeast) winds can push the water south out of these shallow areas and expose the bottom. This phenomenon also has the effect of making the deeper areas temporarily much shallower.

* * *

15. Hurricane Sandy struck the South Point area with high winds on October 29, 2012, . . . changing the contours of the bottom of the coastal bays.

* * *

25. The [USACE] identified a sixty-foot wide "best water route," essentially an area of deeper water, which ran through all of the proposed lease areas, roughly in an east-west direction. . . . .

11

26.  In response to the [USACE]'s findings, . . . [Marsh] . . . revised [his] application . . . .

* * *

29.  [As revised,] [a]ll three [proposed lease] areas lie south of [the USACE]'s best water route; the western and middle areas are about ninety feet south and the eastern area is about 100 feet south at its closest point.

(Footnote omitted.)

In the "Discussion" section of his decision, the ALJ stated that the first issue was what "type of lease [was] being considered."  The DNR's position was that Marsh's application was for a water column lease; the protestants' position was that the application was for a submerged land lease.  The ALJ took note of Roscher's testimony that Marsh's application was "'absolutely' a water column lease" because it was the DNR's policy to treat a lease to raise shellfish in enclosures above the surface of the submerged land as a water column lease, but rejected it, reasoning that it was "contradicted by the words of the statutes."  He pointed out that NR section 4-11A-08(d) provides that a water column leaseholder is permitted to cultivate shellfish "on or under the surface of the water in a floating structure," whereas NR section 4-11A-07(d) provides that a submerged land leaseholder is permitted to "cultivate shellfish on the submerged land, in temporary protective enclosures approved by the [DNR] on the surface of the submerged land, or in any other manner authorized by the [DNR]."  The ALJ found that Marsh did not plan to use floating structures; rather, he planned to cultivate oysters in enclosures resting on the submerged land.  On these bases, the ALJ determined that Marsh's application was for a submerged land lease.

12

The ALJ next turned to the question whether this "distinction cause[d] additional strictures for the DNR in considering whether the lease should be approved." He explained that the protestants were taking the position that pursuant to subtitle 11A the DNR was required to "take into account other uses of the area, including navigation, recreation, and fishing," before approving a submerged land lease. The ALJ disagreed, concluding that the subsection of the statute requiring the DNR to take these considerations into account only applies when it is deciding to preapprove areas for submerged land leases or to prohibit leasing in certain areas. *See* NR § 4-11A-07(e) ("In establishing areas that are preapproved for leasing or that may not be leased under paragraph (1) of this subsection, the [DNR] shall consider potential conflicts presented by other uses of the proposed area, including navigation, recreation, and commercial fishing.").[9]

Having concluded that in this case the statutory criteria for approval of water column leases and of submerged land leases are the same, the ALJ turned to the location criteria set forth in NR section 4-11A-07(c). He found that, although there was testimony that submerged aquatic vegetation is present in the proposed lease areas, the evidence was "clear" that these areas are not in an SAV protection zone. He further found that the proposed lease areas are within 150 feet of the fairway charted by the USACE, but the fairway is not a federal navigation channel, and therefore the proposed lease areas all are more than 150 feet

---

[9]Applications for leases in areas that the DNR has preapproved for leasing go through a streamlined review process and need not be advertised prior to issuance of a lease. *See* NR § 4-11A-09(f).

13

from the closest such channel. He also found that the other five location criteria for a submerged land lease were met. As already mentioned, these same criteria apply to water column leases.

The ALJ concluded, however, that even though the statutory criteria were satisfied, for the DNR to issue the requested lease it had to apply the common law public trust doctrine to determine the "impact of the lease on the public's ability to carry on navigation, trade, and fishing in the proposed lease area." The ALJ explained that the public trust doctrine "establishes the principle that the State owns the navigable waters and submerged land beneath those waters in trust for the benefit of its citizens," and that the principle "puts some limits" on the legislature's authority to regulate the use of the navigable waters and submerged lands. He reasoned that because the legislature had delegated authority to the DNR to review aquaculture leases, the DNR should "consider input from the legislature, local governing bodies and commissions, and the people in making [the decision whether to issue a lease]."

The ALJ found that the DNR had not taken the public trust doctrine into account in approving Marsh's application, and therefore he (the ALJ) would "undertake an analysis [of those considerations] based upon the evidence presented at the hearing." The ALJ found the evidence clear that a "commercial fishery for crabs and finfish exists in the area of the proposed lease." He stated that there was credible testimony that, if Marsh's lease application were approved, crabbing in the area would be disturbed because crabbers would

14

not be able to tell whether their crab pots were sitting on the bottom of the coastal bay or on top of the oyster enclosures.

The ALJ further found that the evidence was "inconclusive" and "insufficient" to permit a finding as to whether the fairway identified in the USACE bathymetric survey had remained in the same location and at the same depth to accommodate the needs of commercial fishermen navigating between South Point and the lease areas. He noted that Mumford and Stewart, both of whom he had accepted as experts in navigation, had opined that the fairway identified by the USACE is narrow and difficult to navigate with a commercial fishing boat. They had described "bouncing" off both sides of the channel as they passed through the area, and had stated that the "channel" had "shifted and become shallower" following Superstorm Sandy. All three commercial fishermen testified that they would be unable or unwilling to use the fairway if the lease were approved for fear that they would unintentionally hit the oyster cages. The ALJ emphasized that numerous residents of South Point had testified that they used the waters near the lease areas for watercraft and that this too was a type of navigation the DNR was required to consider, under the public trust doctrine, in deciding whether to grant a lease application.

The ALJ opined:

> The overall picture that emerges, based on the evidence presented at the hearing, is one of a generally shallow area of two to four feet of water extending south from South Point and through South Point Shoals. An east-west channel or drain with a depth of four or five feet cuts through the shallows in an east-west direction. This channel is the only safe passage for larger boats in the area, and ***the three sections of the proposed lease are in or***

15

*close to the channel*.  The [USACE]'s survey locates the lease areas in 4.1 to 5.3 feet of water, not much different from the depths it identified as the best water route.

(Emphasis added.)  The ALJ found that the "shallow depth[s]" already "significantly constrain[ed] navigation in the area" and that leasing the three areas of submerged land near the only safe passage through the shallow waters would interfere with commercial navigation by fishermen and recreational navigation by residents.  The ALJ concluded that, under the public trust doctrine, the DNR was "not permit[ted] . . . to close off this area for the benefit of [Marsh]," because the right of the public to navigate and fish in the area "outweighed" the State's interest in promoting aquaculture and Marsh's interest in the aquaculture lease.  For these reasons, the ALJ's final decision on behalf of the DNR was that Marsh's lease application would be denied.

### E. Judicial Review in the Circuit Court

Marsh and the DNR filed timely petitions for judicial review in the circuit court.[10] They argued that the ALJ had erred as a matter of law in ruling that the application was for a submerged land lease, rather than for a water column lease, and in denying the application under the public trust doctrine when all the applicable statutory criteria had been satisfied. They argued, moreover, that there was not substantial evidence in the record to support the ALJ's findings that the proposed lease would interfere with fishing and navigation.

_____

[10]Pursuant to section 10-222 of the State Government Article, an agency that delegated the final administrative agency decision in a contested case to the OAH may seek judicial review of that decision so long as the agency was a party before the OAH.

16

The circuit court held a hearing and, on April 30, 2014, filed an opinion reversing the ALJ's decision. The court found that the ALJ's "decision that the disputed lease constituted a submerged land lease, and not a water column lease," was not supported by substantial evidence in the record. The court concluded, however, that that finding had "played no role" in the ALJ's ultimate decision to deny the lease application. The court then turned to the public trust doctrine. It agreed that the public trust doctrine is recognized in Maryland but found that the legislature had "knowingly incorporated the public trust doctrine into specific statutory sections of the Aquaculture Subtitle," such as by requiring the DNR to take navigation, recreation, and fishing interests into account before preapproving an area for submerged land leasing; and that it is plain that, by including those considerations in some, but not all, of the provisions regulating aquaculture leasing, the legislature intended to modify the common law doctrine to "establish a streamlined and more efficient process of granting aquaculture leases and encouraging aquaculture." On that basis, the court ruled that the public trust doctrine did not apply and that the ALJ had erred by denying the lease application based on his weighing of the competing interests under that doctrine.

The appellants noted this timely appeal. We shall include additional facts in our discussion of the issues.

## STANDARD OF REVIEW

In the instant case, the final agency decision was the decision of the ALJ. In an appeal from a judgment entered on judicial review of a final agency decision, we look "through" the

17

decision of the circuit court to review the agency decision itself. *People's Counsel v. Country Ridge Shopping Center, Inc.*, 144 Md. App. 580, 591 (2002). Our role "in reviewing [the final] administrative agency adjudicatory decision is narrow.'" *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67 (1999) (citing *United Parcel v. People's Counsel*, 336 Md. 569, 576 (1994)). It is limited to determining whether "there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Id.* at 67-68 (quoting *United Parcel*, 336 Md. at 577). "An agency's fact-finding is based on substantial evidence if 'supported by such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kim v. Md. State Bd. of Physicians*, 196 Md. App. 362, 370 (2010) (quoting *People's Counsel v. Surina*, 400 Md. 662, 681 (2007). "The agency's decision must be reviewed in the light most favorable to it; because it is the agency's province to resolve conflicting evidence and draw inferences from that evidence, its decision carries a presumption of correctness and validity." *State Bd. of Physicians v. Bernstein*, 167 Md. App. 714, 751 (2006).

With respect to legal conclusions, although we may "give weight to an agency's experience in interpretation of a statute that it administers, . . . it is always within our prerogative to determine whether an agency's conclusions of law are correct." *Schwartz v. Md. Dep't of Natural Res.*, 385 Md. 534, 554 (2005). "Our review is limited to the conclusions of law actually made by the agency, [however], and we will affirm the agency's

18

decision only if it is sustainable on the grounds given." *Ak's Daks Communications, Inc. v. Md. Securities Div.*, 138 Md. App. 314, 326 (2001).

## DISCUSSION

### I.

The appellants contend the ALJ correctly determined that Marsh's application was for a submerged land lease, not a water column lease, and that the circuit court erred in reversing the ALJ's determination on this point. They assert that because Marsh testified that he planned to use temporary enclosures resting on the bottom of the bay to cultivate oysters and to anchor those enclosures into the substrate, his lease fell within the statutory language describing shellfish cultivation on the submerged land. *See* NR § 4-11A-07(d).

The DNR and Marsh point out that Roscher testified that the DNR and the USACE both treated Marsh's application as one for a water column lease; and that it was the DNR's policy to treat any proposed shellfish cultivation above the surface of the submerged land as a water column lease. They argue that the DNR's policy in this regard is entitled to deference. They also argue that the plain language of the statute does not support the ALJ's conclusion.

The first level facts on this issue are undisputed. Marsh's application (as amended) called for the cultivation of oysters in small mesh cages resting on cylindrical feet that, in turn, would rest on the land at the bottom of Chincoteague Bay. He was not going to use floating structures; the mesh cages would be anchored to the substrate. Roscher testified that

19

"[b]ecause [Marsh] intend[ed] to use cages that rest on the bottom," he was applying for a water column lease. He explained that the DNR does not permit submerged land leaseholders to use "gear or cage equipment that extends above the bottom." Rather, the cultivation carried out via a submerged land lease takes place *within* the submerged land, not above it.

As noted, the ALJ rejected Roscher's testimony on this point, concluding that it was contrary to the statutory language. We agree with the DNR and Marsh that this was legal error. The definition of a "water column lease" in NR section 4-11A-01(p) is a lease of "the column of water on or under the surface of the water *and above the surface of the submerged land.*" (Emphasis added.) In contrast, the definition of a "submerged land lease" in NR section 4-11A-01(n) is a lease of "*any land lying beneath the waters of the State*." (Emphasis added.) These definitions make plain that oysters cultivated in cages located above the surface of the submerged land are being cultivated in a water column and not in submerged land. Thus, Marsh's application was for a water column lease. The DNR's reading of the statutory definitions, as expressed by Roscher, was correct.[11]

_____

[11] Ordinarily, we accord deference to an agency's interpretation of the statute it administers. *See, e.g., Marzullo v. Kahl*, 366 Md. 158, 172 (2001) ("an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight"); *Lussier v. Md. Racing Comm'n*, 343 Md. 681, 696-97 (1996). Roscher's testimony was that the DNR always treats lease applications to cultivate shellfish in any enclosure above the surface of the submerged land as a water column lease. The DNR's long-standing interpretation of the statute was entitled to deference.

20

The ALJ did not examine the pertinent statutory definitions. Instead, he relied on other language in subtitle 11A that grants the DNR discretion to permit a submerged land leaseholder to cultivate shellfish "in temporary protective enclosures approved by the [DNR] on the surface of the submerged land, or in any other manner" it approved. NR. § 4-11A-07(d). That the DNR has such discretion does not alter the statutory definitions of the two types of aquaculture leases; nor does it mean that the DNR must treat every application to cultivate shellfish in cages on the surface of the submerged land as a submerged land lease. Similarly, the language in NR section 4-11A-08(d) permitting a water column leaseholder to cultivate shellfish "on or under the surface of the water in a floating structure" if approved by USACE or "[i]n any other manner authorized by the [DNR]" plainly does not require that water column cultivation occur *only* in a floating structure or prohibit cultivation from taking place in cages resting on the submerged land, so long as the cultivation itself occurs in the water column, not under the ground.

Accordingly, the ALJ erred as a matter of law in determining that Marsh's application was for a submerged land lease, not for a water column lease.

**II**.

As the DNR points out, the ALJ's erroneous finding that Marsh applied for a submerged land lease, not a water column lease, did not alter his disposition in this case. Before the ALJ, the protestants had argued that an application for a submerged land lease is subject to stricter scrutiny by the DNR than an application for a water column lease. The

21

ALJ rejected this argument, concluding that the same seven location criteria apply to both types of aquaculture leases and that those criteria all were met. The finding that the seven location criteria were satisfied was supported by substantial evidence in the record.

As recounted above, even though all seven location criteria for granting an application for an aquaculture lease were met, the ALJ denied Marsh's application, based on the common law public trust doctrine. He reasoned that, under that doctrine, before granting an application for an aquaculture lease, the DNR must weigh the interests of the applicant in leasing an area of the water column (or, in the ALJ's view, an area of submerged land) and the DNR's interest in promoting aquaculture against the interests of nearby residents and commercial fisherman to navigate and fish in the area. The ALJ engaged in that weighing process himself and found that the proposed lease would interfere significantly with the interests of the residents and fishermen and that those interests outweighed Marsh's interest in raising oysters.

Appellant Diffendal argues that the ALJ correctly ruled that the public trust doctrine applies and that it requires the DNR to consider conflicts with navigation, recreation, and commercial fishing before granting an aquaculture lease. He maintains that the evidence was "overwhelming" and "uncontroverted" that the Marsh aquaculture lease would interfere with commercial fishing in the area. He argues, moreover, that the lease application was subject to being denied pursuant to NR section 4-11A-09(d)(4) because it raised "serious, legitimate, and immediate public safety issues." Appellant Tunis argues that the public trust doctrine is

an "independent equitable consideration" **and** that its "elements are embodied in the [NR section] 4-11A-07 [pertaining to submerged land leases] and [NR section] 4-11A-09 [pertaining to the process for applying for a lease]." Specifically, she points to the language permitting the DNR to deny a lease application "for reasonable cause" or with "conditions" "as it considers necessary to protect the public health, safety, and welfare." NR § 4-11A-09(d)(4). Finally, appellant Shandrowsky argues that the court erred by concluding that the legislature intended by the enactment of subtitle 11A to abrogate the common law public trust doctrine.

The DNR responds that the common law public trust doctrine does not apply so as to require it to engage in an "extra-statutory analysis" of the impact an aquaculture lease will have on navigation, recreation, or commercial fishing in deciding whether to grant it. Rather, the public trust doctrine was incorporated in the statutory criteria, which reflect the legislature's intent to "manage the uses of [Maryland's waterways] in a way that is in the best interest of the entire public." Marsh makes the related argument that in enacting subtitle 11A the legislature exercised its authority under the public trust doctrine to regulate aquaculture in the Chesapeake Bay and the coastal bay areas in the best interest of all the citizens of the State. Thus, with respect to aquaculture leases, the common law doctrine has been superseded by subtitle 11A. It follows that the public trust doctrine is not an independent restriction on the DNR's authority to issue such leases.

"The navigable waterways within Maryland's boundaries and the lands beneath them generally are 'held' by the State for the benefit of the inhabitants of Maryland." *Anne Arundel Cnty. v. City of Annapolis*, 352 Md. 117, 132 (1998); *see also Clickner v. Magothy River Ass'n, Inc.*, 424 Md. 253, 267 (2012). Under the public trust doctrine, therefore, the State acts as a "'*quasi trustee* for the public benefit and to support the rights of navigation and fishery to which the entire public are entitled therein.'" *City of Annapolis*, 352 Md. at 133 (quoting *Mayor of Baltimore v. Baltimore & Philadelphia Steamboat Co.*, 104 Md. 485, 494 (1906)).

In its role as "quasi trustee" over the navigable waters, the State has the authority to regulate the use of those waters. *See Harbor Island Marina v. Bd. of Cnty. Comm'rs.,* 286 Md. 303, 314 (1979) ("As proprietor of [waters held in public trust], the State holds all powers of regulation and control over these 'lands,' subject to the paramount power of the United States to regulate navigation"); *see also*, *generally* Title 4 of the NR Article (regulating fishing, crabbing, and shellfish harvesting); NR § 8-701 *et seq*. (regulating boating on State waterways). The General Assembly was exercising its regulatory power as quasi-trustee for the benefit of all the citizenry when it enacted subtitle 11A. In doing so, it expressly stated that a thriving aquaculture industry would benefit the State. The location criteria for aquaculture leases require that those areas be set back from shorelines, public shellfish fishery areas, registered pound net sites, and federal navigation channels. *See* NR §§ 4-11A-07(c) & 4-11A-08(c). These restrictions are tailored to accommodate the public's

24

interest in the use of the waters for recreation and navigation and to protect the right of the public to fish, while advancing the State's interest in promoting commercial fishery. If the statutory criteria are met, the only basis on which a lease application may be denied is "for reasonable cause" to protect "the public health, safety, and welfare." NR § 4-11A-09(d)(4). Thus, the DNR is not bound to inquire into the impact of each lease application on navigation and fishing interests.[12]

The appellants have not cited, and our research has not revealed, any Maryland case holding that when the legislature has exercised the power of the State under the public trust doctrine to regulate the use of navigable waters, the public trust doctrine nevertheless continues to apply to require a balancing of interests above and beyond the statutory criteria set by the legislature. We conclude that the ALJ erred as a matter of law in holding that the public trust doctrine imposed additional, extra-statutory restrictions on the grant of an aquaculture lease and in denying Marsh's application on that basis.

Because the ALJ found as a fact that the statutory location criteria had been met, the lease application had to be granted absent a finding that "reasonable cause" existed to deny the application to "protect the public health, safety, and welfare." NR § 4-11A-09(d)(4).

---

[12] We agree with the DNR, moreover, that the interests of nearby property owners and commercial fishermen who frequent the waterway in question may not be equated to the interest of the public generally. The State holds the lands in trust for all of the citizens, not just those with administrative standing to protest a lease application. Thus, a contested case hearing never would be the appropriate forum to adjudicate the public's rights under the public trust doctrine. This is appropriately a legislative inquiry. *See, e.g.*, NR § 1-501 *et seq.*, Environmental Standing Act.

Appellants Diffendal and Tunis contend that because the ALJ found that the grant of the lease application would create "unsafe" conditions, we can and should affirm the final agency decision to deny the lease on the basis of reasonable cause under that subsection. We disagree. The ALJ made abundantly clear that he was denying the lease application pursuant to the common law public trust doctrine, not pursuant to NR section 4-11A-09(d)(4). Aside from a passing reference to the testimony of residents of South Point and the commercial fishermen that the placement of oyster cages on the bottom of the bay could create "unsafe" conditions, the focus of his decision was on interference with navigation and recreation. The ALJ did not make any finding under NR section 4-11A-09(d)(4).

We need not remand this matter for the ALJ to make a finding under that statutory subsection, however, because the record of the contested case hearing is devoid of competent evidence that would support a finding that the "public health, safety, and welfare" would be at risk if Marsh's lease application were granted. The testimony and evidence before the ALJ showed, at most, that the grant of the lease application might inconvenience commercial fisherman attempting to navigate along the east-west fairway, particularly at low tide or in very windy conditions. The three fishermen who testified all stated they would continue to fish and crab in the area, however. Moreover, the testimony of the fishermen and the residents generally was that navigation between and around the coastal bays around South Point *always* was difficult because of the shallow depths.

26

We agree with DNR and Marsh, moreover, that the testimony by residents that the grant of the lease application presented serious safety concerns was speculative. These witnesses stated that they routinely navigated on jet skis, sailboats, and motorboats around "forest[s]" of crab pots extending 20 inches above the substrate and through shallow areas where they frequently ran aground. This testimony could not be reconciled with their testimony that the presence of wire mesh cages anchored to the bottom of the bay and extending no more than 12 inches above the surface in an area with water depth between 4 and 5 feet would pose a hazard to them or their children. There was no evidence that similarly placed oyster cages ever had presented a safety hazard or that the hazard was different in character than the hazard posed by the use of commercial crabbing pots. In sum, none of the evidence presented by protestants before the ALJ rose to the level of a threat to the public health, safety, or welfare sufficient to justify a denial of the lease application for reasonable cause under NR section 4-11A-09(d)(4).

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**